892 F.2d 430
 SNS CONTRACTORS, Plaintiff,
v.
ALGERNON BLAIR, INC., and United States Fidelity and
Guaranty Co., Defendants Third Party
Plaintiffs-Appellees, Cross-Appellants,
v.
CARTERET SAVINGS BANK F.A., Third Party Defendant-Appellant,
Cross-Appellee.
FISCHBACH AND MOORE, INC., Plaintiff,
v.
ALGERNON BLAIR, INC., et al., Defendants.
 No. 89-3091.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 25, 1990.
 
 John M. Landis, Marcus V. Brown, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for third party defendant-appellant, cross-appellee.
 Robert L. Redfern, Paul J. McMahon, III, New Orleans, La., for defendants third party plaintiffs-appellees, cross-appellants.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before THORNBERRY, GARWOOD, and DUHE, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 Carteret Savings Bank, F.A., ("Carteret"), third-party defendant/appellant, appeals a judgment holding it liable to Algernon Blair, Inc. ("Blair"), defendant/appellee, on Blair's third-party claim for sums due pursuant to the assignment of a construction contract. We affirm the district court judgment.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 Blair, as general contractor, entered into a construction contract on June 12, 1985, with Three Lakeway Center Partnership ("Three Lakeway"), as owner, for the construction of a hotel and office complex in Metairie, Louisiana. Carteret agreed to make a construction loan of $82 million to Three Lakeway, with participation in the loan by other lenders. The loan was secured by numerous items of security, including a $90 million collateral mortgage on the project. Another required item of security was a collateral assignment ("Collateral Assignment") by Three Lakeway to Carteret of Three Lakeway's rights and interests under its construction contract with Blair. In section 6 of the Collateral Assignment, Carteret conveyed back to Three Lakeway a license to exercise all rights under the construction contract (which were now assigned to Carteret) so long as Three Lakeway did not default on its obligations under the loan agreement. Section 7 of the Collateral Assignment allowed Carteret to terminate the license upon default by Three Lakeway, and thereafter to exercise all of Three Lakeway's rights under the construction contract.
 
 
 3
 As a condition precedent to Carteret's advance of funds to Three Lakeway under the loan agreement, Carteret obtained Blair's consent to abide by the Collateral Assignment in a document entitled "Contractor's Consent and Certification" ("Contractor's Consent"). In section 3 of the Contractor's Consent, Blair agreed to obtain prior written consent from Carteret before agreeing to any change in the construction contract or any change order with subcontractors, to notify Carteret of any default by Three Lakeway under the construction contract, and to refrain from terminating the construction contract unless Carteret failed to remedy such default by Three Lakeway within sixty days. Additionally, section 3(d) provided:
 
 
 4
 In the event that Borrower defaults under the Loan Agreement and does not cure the default within the time thereby allowed, or if there is a foreclosure on the mortgage securing the payment of the Loan, or if the Borrower becomes insolvent, the Contractor will, at the election and option of the Lender, and provided further that Lender continues to make disbursements to Contractor in accordance with the terms of the Construction Contract, complete its obligations under the Construction Contract with respect to the construction of the improvements for a contract price calculated pursuant to the Construction Contract for the benefit of and with no additional charge or expense to Lender, its nominee or wholly owned subsidiary, it being agreed that such contract price shall in no event exceed the maximum contract price stipulated in Section 2(iii) hereof. Notwithstanding the above, in the event of any default by Borrower under the Loan Agreement, Lender agrees that the Contractor shall be paid for the work done by it up to the date of such default and termination of the Construction Contract by Lender, including a pro-rata share of its construction fee and retainage.
 
 
 5
 (Emphasis added.) Blair's claim against Carteret rests upon the italicized portion of this provision.
 
 
 6
 The parties established an arrangement for disbursement of the loan proceeds. Section 2.1 of the loan agreement provided that Carteret would make periodic advances of the loan proceeds to Three Lakeway upon Three Lakeway's written requests. Section 16.6 of the construction contract provided that Blair would submit monthly payment requests to the architect for approval, who would forward them to Three Lakeway for payment. Three Lakeway arranged for Carteret to transfer Blair's portion of the disbursements directly to Blair.
 
 
 7
 Blair substantially completed construction of the project and obtained certificates of substantial completion for the two phases of construction on March 27, 1987, and September 14, 1987. After September, Carteret made two of its regular monthly loan advances directly to Blair pursuant to Three Lakeway's authorization. Three Lakeway withdrew its authorization for direct payments to Blair in November or December and requested that Carteret make subsequent loan advances to it rather than Blair. Blair requested its final payment in the amount of $1,498,304.00 on January 20, 1988, and the architect submitted its approval for this payment to Three Lakeway on February 2, 1988. Stephen A. Cole, a vice president of Carteret, testified that Carteret did not make the loan advance that would have covered the final payment due to Blair because Carteret and Three Lakeway disagreed as to the amount of a credit due Three Lakeway under the final change order. The parties agreed at trial that the figure of $1,498,304.00 represented the value of the work actually done by Blair for which Blair had not yet been paid.
 
 
 8
 The loan from Carteret to Three Lakeway matured on December 14, 1987. Carteret claims it never declared Three Lakeway in default before maturity, although in September 1987, Carteret became aware that Three Lakeway was experiencing financial difficulties and had insufficient funds to complete full construction of the building. Blair, however, was not aware of Three Lakeway's financial difficulties at that time. Carteret negotiated unsuccessfully with the participating lenders from October 1987 to the end of January 1988 in an attempt to modify and extend the construction loan. At the time of maturity two line item overruns were still unresolved, and Three Lakeway was without funds to resolve them. Carteret finally called in the loan and Three Lakeway filed bankruptcy in February 1988.
 
 
 9
 SNS Contractors, Inc., and Fischbach and Moore, Inc., two subcontractors, brought separate actions in late February 1988 against Blair and the United States Fidelity and Guaranty Company (the surety that issued Blair's payment and performance bonds for the project) in Louisiana state court for sums still owed under their subcontracts. Blair removed the actions to the United States District Court for the Eastern District of Louisiana. Blair then filed a third-party complaint against Carteret, alleging that Carteret owed Blair money pursuant to the Collateral Assignment and the Contractor's Consent. The two cases were consolidated.
 
 
 10
 After a bench trial on December 12, 1988, the district court entered judgment against Blair in favor of SNS Contractors for $93,536.55 and in favor of Fischbach and Moore for $145,472.20, plus interest. The district court entered judgment for Blair and against Carteret on the third-party claim in the amount of $1,498,304.00, the outstanding principal balance owed to Blair for work performed on the project. Blair also sought early completion bonuses and reimbursement for additional expenses for delays allegedly caused by Three Lakeway pursuant to the construction contract, but the district court denied these on the ground that the language of the Contractor's Consent indicated that Carteret did not obligate itself to pay for such amounts. That ruling on bonuses and expenses for delay is not before us on appeal. Before us is Carteret's appeal of the judgment on the third-party claim, holding Carteret liable to pay for the work performed by Blair.
 
 DISCUSSION
 I.
 
 11
 Carteret first argues that the Collateral Assignment and the Contractor's Consent together constitute a suretyship agreement under Louisiana law, and that federal law prohibits a federally chartered savings bank from becoming a surety outside certain limitations specified in federal regulations. See 12 U.S.C. § 1464(b)(2); 12 C.F.R. § 545.103 (1989). Carteret asserts that the transaction in this case falls outside those limitations, and therefore the suretyship is ultra vires and unenforceable.
 
 
 12
 The district court expressly held that the agreements at issue did not create a suretyship. Since a question of contract interpretation is a matter of law, this court is not bound by the clearly erroneous standard of review in Fed.R.Civ.P. 52(a), but may interpret the contract language by its own independent examination. In re Stratford of Texas, Inc., 635 F.2d 365, 368 (5th Cir.1981). After independently examining the agreements in this case, we agree that Carteret's obligation is not a suretyship. Therefore, we do not reach Carteret's argument that a suretyship would be ultra vires under federal regulations.
 
 
 13
 Under Louisiana law, a suretyship is "an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so." La.Civ.Code Ann. art. 3035 (West Supp.1989). "A contract is accessory when it is made to provide security for the performance of an obligation." La.Civ.Code Ann. art. 1913 (West 1987).
 
 
 14
 We do not think the documents executed by the parties create a suretyship because Carteret's obligation in section 3(d) to pay Blair is not an accessory contract, entered into merely to provide security for the performance of Three Lakeway's obligation to Blair. It is part of a group of documents executed concurrently involving one project, in which Blair, Three Lakeway, and Carteret each undertook certain obligations. Those obligations were all dependent upon each other.
 
 
 15
 In the Contractor's Consent itself Blair had to agree, as a condition precedent to Carteret's executing the loan agreement, to the assignment of the construction contract to Carteret. This was unlike the usual suretyship or guaranty, in which the surety simply promises the creditor to fulfill the debtor's contractual obligation if the debtor defaults in fulfilling his obligation to the creditor, and the creditor makes no promises to the surety in return.[1] Blair undertook certain reciprocal obligations to Carteret in the Contractor's Consent. Blair promised: (a) to consent to the assignment of the construction contract, (b) to obtain Carteret's consent to any amendments to the construction contract, (c) to obtain Carteret's consent to any change orders, (d) to notify Carteret of any default by Three Lakeway, (e) to refrain from taking any action upon Three Lakeway's default until Carteret had an opportunity to remedy such default, and (f) to complete its obligations under the construction contract in the event of default if Carteret wished. Although such promises by a contractor may be typical in construction loan transactions, in this case Blair obtained in return for its promises Carteret's promise that Blair would be paid for work it had done up to the date of Three Lakeway's default.
 
 
 16
 Carteret correctly states that under Louisiana law, all provisions in a contract must be interpreted together to give each the meaning suggested by the contract as a whole. La.Civ.Code Ann. art. 2050 (West 1987); Makofsky v. Cunningham, 576 F.2d 1223, 1230 (5th Cir.1978); Lambert v. Maryland Casualty Co., 418 So.2d 553, 559 (La.1982). Moreover, the fact that the Contractor's Consent refers to the Collateral Assignment, the construction contract, and the loan agreement indicates the parties' intent that the Contractor's Consent be interpreted together with all of these documents. See Breaux v. Laird, 223 La. 446, 450, 65 So.2d 907, 908 (1953); Admiral Paint Co. v. Goltzman, 254 So.2d 104, 106 (La.Ct.App.1971).
 
 
 17
 The overall purpose of the Contractor's Consent and Collateral Assignment was to protect Carteret's rights under the loan agreement and limit its risk of loss for the loan, not to protect Blair's rights as creditor or limit Blair's risk of loss. To this end, Carteret was assigned all of Three Lakeway's construction contract rights and could exercise those rights if it chose to do so. Nevertheless, we do not think Carteret can be considered a full principal to the construction contract, as Blair urges, because Three Lakeway was supplanted by Carteret as to its rights under the construction contract, but not as to its obligations. Three Lakeway still had to fulfill its obligations to Blair under the construction contract.
 
 
 18
 Admittedly, Blair did want to limit its risk of loss, and requested Carteret's promise to pay as an inducement for Blair to enter into the construction contract. This makes Carteret's promise seem more like a suretyship, in which the creditor agrees to extend credit to the debtor only if the debtor obtains a surety. But Carteret's obligation under the Contractor's Consent did not contravene the overall purpose of the Contractor's Consent and Collateral Assignment because Carteret did not undertake a greater risk by promising to pay Blair. Carteret's obligation, when construed in conjunction with the other documents, was to advance funds to Blair that were already earmarked for construction of the Three Lakeway project as part of the construction loan agreement between Carteret and Three Lakeway. Carteret admitted that the only reason it did not make the advance that included Blair's final payment was because it disagreed with Three Lakeway over the amount of a change order also included in that advance. In the circumstances described above, Carteret's obligation in section 3(d) was not a suretyship.
 
 II.
 
 19
 Carteret makes an alternative argument that the several provisions of the Contractor's Consent construed together did not create a suretyship, but rather a conditional obligation that would come into existence only if Carteret exercised its rights under the Collateral Assignment. Carteret argues that the conditions triggering Carteret's performance of its obligation under section 3(d) of the Contractor's Consent never occurred. Carteret never exercised its option to revoke Three Lakeway's license and now urges that as a consequence it did not have to pay Blair pursuant to section 3(d) of the Contractor's Consent.
 
 
 20
 Construing the several documents together, Carteret urges that section 17 of the Collateral Assignment establishes that Carteret's obligation in section 3(d) of the Contractor's Consent is conditioned upon Carteret's exercising its option to terminate Three Lakeway's license. According to Carteret, this is because section 17 provides that Carteret, in accepting the assignment of Three Lakeway's rights under the construction contract, did not accept any of its obligations. It is true that Carteret did not accept Three Lakeway's construction contract obligations. But through the insertion of the second sentence in section 3(d), Carteret undertook its own obligation, separate from Three Lakeway's obligation, to see that Blair would be paid from the loan proceeds.
 
 
 21
 If Carteret had exercised its option to terminate the license granted to Three Lakeway, under the first sentence of section 3(d) it could have elected to assume Three Lakeway's right to enforce the construction contract and therefore also to assume Three Lakeway's payment obligations under that contract. But Carteret's obligation in the second sentence of section 3(d) is a separate obligation "[n]otwithstanding the above, in the event of any default by Borrower under the Loan Agreement." This obligation does not appear to be dependent upon the termination of Three Lakeway's license under the terms of the Collateral Assignment. It is dependent, however, upon Three Lakeway's default under the loan agreement. Additionally, the second sentence of section 3(d) seems to indicate that termination of the construction contract by Carteret is also a prerequisite to Carteret paying Blair for work done: "Lender agrees that the Contractor shall be paid for the work done by it up to the date of such default and termination of the Construction Contract by Lender...." (emphasis added).
 
 
 22
 Carteret argues that it did not terminate the construction contract so as to incur liability under section 3(d). Carteret had the power to terminate the contract only if it stepped into Three Lakeway's shoes by terminating the license it granted to Three Lakeway and thereafter exercising Three Lakeway's right to terminate the contract as granted to Carteret in the Collateral Assignment. (Sections 15.2 of the construction contract and 14.2 of the General Conditions of the Contract for Construction describe Three Lakeway's right to terminate the construction contract.) Carteret never terminated the license to Three Lakeway, and never terminated the construction contract.
 
 
 23
 At the time of Three Lakeway's default, however, construction was complete. Even though Three Lakeway's default ordinarily would have allowed Carteret to revoke Three Lakeway's license and terminate the construction contract, Carteret could not terminate the construction contract once Blair had performed because there was nothing left to terminate.
 
 
 24
 Blair's completion of performance under the construction contract benefitted Carteret because it protected Carteret's investment in the project: A completed building was more valuable to Carteret than an unfinished one. If Carteret had terminated the construction contract before construction was completed, then under the first part of section 3(d), Carteret could have required Blair to continue construction but would have been obligated to pay Blair. Even if Carteret did not require Blair to continue with further construction, under the second part of section 3(d), Carteret would have been obligated to pay Blair for work already done up to the date of the construction contract's termination. Instead, Carteret allowed Blair to continue construction without informing Blair of Three Lakeway's impending default. We agree with Blair that Carteret's failure to terminate the construction contract before completion did not preclude its obligation to pay Blair for work already done.
 
 
 25
 Carteret also contends that Three Lakeway was never in default under the loan agreement so as to trigger Carteret's obligation in section 3(d). Stephen A. Cole, Carteret's vice president, testified about specific times when Carteret could have declared Three Lakeway in default but did not do so. He testified that Carteret was in a position to declare a default on the loan when Three Lakeway first experienced line item overruns, and again when Three Lakeway did not pay Carteret upon the loan's maturity.
 
 
 26
 Although Carteret did not declare Three Lakeway in default before construction was complete, it is evident from the testimony at trial that Carteret declared the loan in default at some point after construction was complete and after December 14, 1987, when the loan matured. Mr. Cole admitted on cross-examination that Three Lakeway's difficulties in obtaining sufficient funds to complete the building culminated in Three Lakeway's default on the loan. At another point in his testimony he agreed that the situation of Three Lakeway not having enough funds to complete construction because of overruns on certain line items continued until Carteret finally declared the loan in default.
 
 
 27
 It is not clear from the record exactly when Carteret actually considered Three Lakeway in default and called in the loan, but the parties do not dispute that Carteret called in the loan. Under the promissory note evidencing Three Lakeway's obligation to repay its debt under the loan agreement, Carteret had the option to request payment in full from Three Lakeway upon any default under the promissory note or the collateral mortgage. By exercising this option to call in the loan, Carteret indicated that it considered Three Lakeway in default. Therefore, Carteret must fulfill its obligation under section 3(d) to pay Blair "for the work done by it up to the date of such default."
 
 CONCLUSION
 
 28
 The obligation that Carteret assumed in the second sentence of section 3(d) of the Contractor's Consent was not a suretyship. It was an obligation to pay Blair out of the loan proceeds for work done by it up to the date of Three Lakeway's default. Because Three Lakeway defaulted under the loan agreement, and the construction contract could no longer be terminated after construction was complete, Carteret must now fulfill the obligation it assumed. The judgment of the district court is AFFIRMED.
 
 GARWOOD, Circuit Judge, dissenting:
 
 29
 I respectfully dissent.
 
 
 30
 The issues are certainly not free from doubt and Judge Thornberry fairly states the best case for affirmance. Nevertheless, I would construe the Collateral Assignment of the construction contract and the Contractor's Consent as being in substance a security assignment and consent thereto, so that neither document imposed any obligation on the lender, Carteret, to see to it that the general contractor, Blair, was paid for its work under the construction contract, unless and until Carteret in effect foreclosed on its security interest in the construction contract by terminating the license of the owner-borrower, Three Lakeway.
 
 
 31
 The majority notes: "[i]f Carteret had exercised its option to terminate the license granted to Three Lakeway, under the first sentence of section 3(d) [of the Contractor's Consent] it could have elected to assume Three Lakeway's right to enforce the construction contract and therefore also to assume Three Lakeway's payment obligations under that contract," and "Carteret had the power to terminate the [construction] contract only if it stepped into Three Lakeway's shoes by terminating the license it granted to Three Lakeway ..." (emphasis added). Since the second sentence of section 3(d) of the Contractor's Consent, on which Blair relies, expressly postulates "termination of the Construction Contract by Lender " (emphasis added), it therefore also necessarily presupposes that the lender, Carteret, had "stepped into Three Lakeway's shoes [under the construction contract] by terminating the license it granted to Three Lakeway," for that is the "only" way the lender could terminate the construction contract. Here the majority holds that Carteret never terminated Three Lakeway's license and hence never either stepped into Three Lakeway's shoes under the construction contract or had the power (or purported) to terminate the construction contract. It follows from this that neither the first nor the second sentence of section 3(d)--on which Blair's recovery is predicated--is applicable.
 
 
 32
 If, however, the Contractor's Consent is construed to require Carteret to pay Blair whatever Blair is due under the construction contract, regardless of whether Carteret has ever revoked Three Lakeway's license or cancelled the construction contract, then it seems to me that the Contractor's Consent was in this respect a contract of suretyship or guaranty.[1]
 
 
 33
 As the majority correctly recognizes, Carteret was never a principal in the construction contract, and it had no interest in the project being built, or in Three Lakeway or the construction contract, other than a creditor's security interest to secure its loan to Three Lakeway. It is plain that if the Contractor's Consent imposes on Carteret any liability to Blair for sums owing under the construction contract, where Carteret has not revoked Three Lakeway's license, or stepped in its shoes under or cancelled the construction contract, then such liability must necessarily be secondary to that of Three Lakeway and must be the liability of one who is not a principal. That species of liability is guarantor or suretyship liability.
 
 
 34
 The character of the liability as that of guarantor or surety is clearly not changed by reason of the fact that the guarantor or surety receives consideration for acting as such or some incidental benefit from the transaction being guaranteed. Of course, all species of customer guarantees are not prohibited to federally controlled financial institutions. Letters of credit are an example. But in such instances, the transaction is usually treated, for purposes of documentation, reflection on the books, and other regulatory limitations, similarly to a loan to the principal whose obligation the financial institution is guaranteeing. See 12 U.S.C. § 1464(b)(2); 12 C.F.R. § 545.103.
 
 
 35
 And, where the transaction is one primarily for the financial institution's direct benefit, it may not be viewed as unauthorized even though it is in form the guaranty of another's obligation. The authorities in this regard are reviewed in Norton Grocery Co. v. Peoples National Bank, 151 Va. 195, 144 S.E. 501 (1928). But these are typically situations where the financial institution's previously made loan has been put in jeopardy and it therefore has, in effect, taken over the security or the borrower's business, and then guarantees third party advances to or for the benefit of that security or business. When the guaranty is entered into, the financial institution has already in substance become a principal in the business or property for the benefit of which the guaranteed funds are thereafter advanced.[2] This case would be analogous to those if Carteret, due to Three Lakeway's default, had terminated its license and stepped into its shoes. But that is not what happened here. Rather, the majority holds Carteret liable on the theory that from the very beginning it agreed to stand good for the construction contract payments that might become due to Blair. Such an agreement, even though supported by consideration and incidentally beneficial to Carteret, is clearly a guaranty, since Carteret was not a principal in the construction contract and, at that point, had and intended to have no more than a creditor's security interest in the building to be erected and in Three Lakeway. In those circumstances, the undertaking that the majority says Carteret made in favor of Blair would, in my opinion, constitute Carteret a "surety" for Three Lakeway within the meaning of 12 U.S.C. § 1464(b)(2), thus requiring compliance with 12 C.F.R. § 545.103 (1984), which was apparently not achieved, or even attempted, here. Because the majority does not reach the question of the effect on Blair's rights as against Carteret if this obligation is one of suretyship, no useful purpose would be served by this dissent addressing that issue. As previously indicated, the relevant documents reasonably can, and in my view should, be construed not to impose such an improper suretyship obligation on Carteret.
 
 
 
 [1]
 The creditor's extension of credit to the debtor would ordinarily constitute the consideration for the surety. Of course, if the surety is a company whose business is being a surety, the surety charges a premium for the risk it takes
 
 
 [1]
 Under Louisiana law "[a] contract of guaranty is equivalent to a contract of suretyship and the two terms may be used interchangeably." Guaranty Bank & Trust Company v. Jones, 489 So.2d 368, 370 (La.App.1986)
 
 
 [2]
 As the Norton Grocery Co. opinion states (144 S.E. at 505):
 "The underlying principle in the cases relied upon is this: A bank may not lend its credit to another, even though such a transaction turns out to have been of benefit to the bank, and in support of this a list of cases might be cited, which would look like a catalogue of ships; but there is no reason in principle why a bank may not pledge its credit for its sole benefit in an effort to save itself from loss imminent under some lawful contract, and the fact that it may rebound incidentally to the benefit of another does not invalidate the transaction, and this notwithstanding the fact that the transaction is termed one of guaranty. Ellis v. Citizens' Nat. Bank, 25 N.M. 319, 183 P. 34, G.A.L.R. 166. There is no black magic in a name."