[No. H020669. Sixth Dist. Aug. 31, 2001.]

In re the Marriage of BUFF and JAMES MARK STEINBERGER.
BUFF JONES, Respondent, v.
JAMES MARK STEINBERGER, Appellant.

1450

1452

## COUNSEL

Hugh Thomson for Appellant.

Robin Yeamans & Associates and Robin Yeamans for Respondent.

## OPINION

**COTTLE, P. J.**—After a court trial in a marital dissolution action, the court entered judgment regarding the character and disposition of certain property of the parties. On appeal, the husband contends that the trial court erred with regard to wife's severance pay, certain stock options, and a diamond ring. We find no error by the trial court with regard to wife's severance pay and the stock options, but reverse the judgment with regard to the diamond ring.

## I. FACTS

### A. *Procedural Background*

Petitioner Buff Jones and defendant James Mark Steinberger were married on April 30, 1988. They separated on June 14, 1997, after a marriage of 9 years and 1.5 months. The parties have one minor son, born in January of 1996. A status-only dissolution of marriage was filed on December 28, 1998. Later, some of the parties' financial issues were handled by agreements reflected in a stipulated judgment filed on August 13, 1999. Other issues were handled in a court trial, which included the testimony of both parties and other witnesses. The trial was concluded on February 5, 1999, and the resulting judgment was filed on September 2, 1999. The judgment included provisions regarding (1) Buff's severance pay from her employer, Compuware; (2) certain stock options Buff had received from Compuware; and (3) a diamond ring. James has filed a timely appeal focusing on these issues.

### B. *Buff's Employment with Compuware*

On January 7, 1993, Buff was offered employment at Compuware as executive director of the product management group for the systems software division. On March 1, 1993, Buff commenced her employment with Compuware. Buff's position normally carried a title of vice-president, and Compuware's letter offering Buff employment indicated that after Buff's first quarter, assuming satisfactory performance, her name would be submitted to the board of directors for election to vice-president. Although the letter stated that Buff would participate in the "Executive Bonus Program," stock options were not specifically mentioned in the letter.

Buff's testimony at trial indicated that the executive bonus program had two parts: a cash bonus and stock options. The cash bonus was always based on past performance. The stock options were understood by Buff to be "for future performance," partly because when they were granted, they had no value and would attain value only if the stock rose in value from the date of the grant. Buff understood that the options would vest only through her termination date, and anything vesting after that date would be lost.

On June 1, 1993, Buff received the title of vice-president.

Later, on or about April 1, 1995, Buff signed a detailed employment agreement (Agreement), which included exhibits A and B. Section 4.3 of the Agreement stated that Compuware "reserve[d] the right to terminate the Employment Term for its convenience. If the Employment Term is terminated for the convenience of Company, Company shall continue to pay

Executive compensation hereunder at the rate of his Annual Salary as in effect on the date of termination, for a period ending as provided in Exhibit A . . . ." The initial exhibit A to the Agreement indicated that Buff's termination date under the contract was March 31, 1997. Exhibit A provided, in part: "Salary Continuation: [¶] (a) After Termination for Convenience pursuant to Section 4.3: Payment of Salary until March 31, 1997. [¶] (b) After Expiration of Employment Term: Salary as of March 31, 1997 to be paid over one (1) year in twelve monthly installments." The Agreement also indicated that the company's salary continuation obligation would be reduced by compensation received by Buff from any employment during the period of the company's salary obligation.

The Agreement indicated that if Buff was terminated "for cause," she would have "no right to receive any compensation or benefit hereunder after the last day of the month in which falls the effective date of such notice." Termination "for cause" was defined to mean (i) material breach of the Agreement or (ii) materially neglecting the employee's duties under the Agreement. Regarding stock options, exhibit A provided that all stock options granted to Buff during her employment would continue to vest until the expiration of the employment term. Finally, the Agreement provided that for a period of one year after the termination of the employment term as defined by the contract, the employee could not engage in, participate in or be employed by any business in competition with Compuware. The Agreement did not require Buff to sign any release of legal claims.

On or about April 1, 1996, Buff signed another exhibit A, which extended her termination date to March 31, 1998. In other respects, the new exhibit A contained essentially the same provisions as the initial exhibit A to the Agreement.

Although the Agreement and its original extension had been signed in April of 1995 and 1996, respectively, Buff did not receive an additional extension of her contract in April of 1997.

On June 14, 1997, the parties separated, and Buff commenced an action for dissolution of the marriage.

C. *Termination of Buff's Employment with Compuware*

On November 10, 1997, Doug Barre, a Compuware senior vice-president to whom Buff reported, appeared without prior notice for a meeting in Buff's office. He met with Buff for approximately 10 minutes, and presented to her a letter from Compuware, dated November 10, 1997. The letter stated that it

was a "summary of the terms of [her] separation from Compuware Corporation, effective November 10, 1997." According to the terms of the letter, Buff would be paid her net monthly salary through November 10, 1998, and would be allowed to continue to vest in the stock option plan through the same date. The letter provided that Buff must sign an attached release by December 2, 1997, in consideration for the terms listed in the letter.

On or about November 24, 1997, Buff did sign a release promising not to bring any claims or lawsuits against Compuware "arising from [her] employment with and/or separation from Compuware Corporation." The release was part of the packet Doug Barre had provided to Buff at the November 10, 1997 meeting. Also on November 24, 1997, Buff wrote a letter to Doug Barre stating that she had sent a letter confirming their conversation of November 17, 1997, and an executed release, "directly to Tom Costello in the Legal Department."

During that same time, Buff received a letter dated November 21, 1997, confirming a conversation she had with Doug Barre. The letter to Buff, signed by Mr. Barre, states in part: "This will confirm our conversation of Monday, November 17, 1997. It is not the intention of myself or of the Corporation to prevent you from obtaining gainful employment. However, it is a restriction of our offer of settlement that you not accept employment with BMC and/or Platinum Corporations for a period of 3 years from date of settlement, November 10, 1997. Further, it is agreed that our settlement will remain in effect for the duration, even if you do obtain other employment in the meantime. [¶] Under this agreement, you have until December 10, 1998, to exercise your vested options."

A Compuware internal document entitled "Employee Status Change Form" confirmed the termination of Buff's employment, and listed the termination as "involuntary." The document stated that Buff was to receive "pay in lieu" through November 10, 1998, and contained the following instruction: "Do not process pay in lieu until signed release is returned."

According to Buff's trial testimony, at the time Doug Barre approached Buff, neither he nor other managers had indicated to Buff directly that they were unhappy with her performance. Nor had Buff received any prior negative reviews. None of her direct superiors had indicated to Buff that she was not doing her job correctly. Buff recognized that her "business unit revenue numbers were not coming in," and that this was her responsibility, but stated: "I felt I was doing a very good job. I was giving it my best."

Subsequently, Buff did receive 12 monthly payments of her net salary at the rate of $18,883 per month through November 10, 1998. In addition,

Buff's stock options were allowed to vest through November 10, 1998. The stock options which vested after she left Compuware included 6,000 shares (after stock splits) that vested on June 1, 1998, and 80,000 shares (after stock splits) that vested on October 25, 1998.

### D. *The Diamond Ring*

A little more than five years after the marriage, the parties bought a loose diamond with community funds. James later set it in a ring and presented it to Buff after their fifth anniversary with a card referring to the five years, and also congratulating Buff on her recent promotion.

Buff testified that she considered it a gift. It was a woman's ring and only she had worn it since receipt. When James was asked at trial whether he presented the ring to Buff as a gift, he stated: "Ah, it was as a gift and as an investment, something that we both could enjoy." James also testified that it was not his intent to give her a fifth year anniversary ring, and that the most expensive gift he had given Buff during the marriage was a Christmas gift that had cost a few hundred dollars.

### E. *The Trial*

After the trial testimony and briefing and argument by the parties, the trial court determined that the entire salary paid during the year after Buff's departure from Compuware should be awarded to Buff as her separate property. Regarding the stock options, the court adopted the calculation set forth in Buff's trial brief, exhibit D, as the correct calculation.[1] The court also reserved jurisdiction to consider further evidence on the tax consequences of this decision. The court found that the diamond ring was unilaterally given to Buff at or about the time of their fifth wedding anniversary as a gift, and that it was therefore Buff's separate property.

## II. DISCUSSION

### A. *Severance Pay*

 On appeal, James argues that Buff's severance pay (the one year of salary paid to her from her termination date, November 10, 1997, through November 10, 1998) was simply a *modification* of Buff's original rights

---

[1]Essentially, by adopting these calculations, the court held that the one-year period from Buff's November 10, 1997 termination through November 10, 1998, would count as part of the denominator of the time rule fraction that determined the community's interest in the stock options. James had argued that the one-year period should not be counted in the denominator of the time rule fraction.

under the employment contract signed during marriage, not a *new* right created after the marital separation. According to James, "[w]hat wife and Compuware did was modify an existing right, not create a new one." James argues that this posttermination salary, derived from a right contained in Buff's original employment contract during marriage and from Buff's service to Compuware during her employment, was partly community property.

Under Buff's employment contract, as noted earlier, Buff would have certain salary rights if she were terminated for the convenience of the company. At the time of the marital separation (June 14, 1997) and the termination of Buff's employment (November 10, 1997), Buff's employment was governed by the Agreement between Buff and Compuware signed April 1, 1995, and by an exhibit A to that Agreement, effective April 1, 1996. The operative exhibit A provided that Buff's employment had a termination date of March 31, 1998, and that after termination for the company's convenience, her salary would be continued until March 31, 1998.[2] James argues that Buff's severance pay was partially community property, and that although Buff and Compuware modified the *amount* of the severance pay at the time Buff left the company, they could not modify the community property *character* of the asset.

Buff argued at trial that at the time she left the company, she was about to be terminated for cause. Under the Agreement, if Buff had been terminated for cause, she would have had "no right to receive any compensation or benefit [under the Agreement] after the last day of the month in which falls the effective date of such notice." Buff argued that because she was about to be fired for cause (and therefore would receive no severance pay whatsoever), all of her severance pay resulted not from the employment agreement signed during marriage, but from her negotiations with Doug Barre and Compuware on or after November 10, 1997.

After hearing the evidence at trial and the arguments of the parties, the trial court adopted Buff's argument and awarded all of the severance pay to Buff as her separate property. The court stated: "Based on all of the evidence presented, the court has concluded that Petitioner [Buff] was in peril of termination for cause, and thus would have lost her contractual right to one year severance pay if she was merely terminated for convenience, (Contract at 4.3). Indeed, the internal documents of Compuware established Ms. Jones

---

[2] Exhibit A also provided that if Buff's employment was terminated for convenience after "expiration of [the] employment term," her salary as of March 31, 1998, would be continued over one year in 12 monthly installments. Because Buff's employment was terminated on November 10, 1997, before her employment term ended on March 31, 1998, this provision does not appear to apply here.

was to be terminated for cause. The court also finds Petitioner's testimony credible on this topic. [¶] Instead, Petitioner negotiated for a new deal, in which she was able to retain her severance pay and to acquire further stock options, in exchange for her relinquishment of her right to work following severance for the two competitors most likely to give her a job. This package, the court finds was Petitioner's separate property as it was to compensate Petitioner both for lost future income [citation] and to settle the possibility of a wrongful termination suit by Petitioner were she terminated for cause . . . [citation.]"

■ We review the trial court's factual finding to determine whether it is supported by substantial evidence. Conflicts in the evidence are resolved in favor of the prevailing party, and all reasonable inferences must be drawn to uphold the trial court's decision. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

■ Under these rules of appellate review, the evidence here is sufficient to sustain the trial court's finding that the severance pay was a right acquired at the time Buff's employment was terminated, and not before. First, Buff's testimony at trial supported the conclusion that she was about to be terminated for cause. She had no notice from Doug Barre that he was coming to meet with her on November 10, 1997. That day, in a very short meeting, Mr. Barre presented her with a letter outlining the terms of her separation from the company, about which she had no prior notice. Second, Buff also testified that her "business unit revenue numbers were not coming in," for which she was responsible, and that she had heard that management was unhappy with her performance. Third, it is clear from both the termination letter given to Buff and from internal Compuware documents that Buff would receive no severance pay unless she signed a release of any claims or lawsuits against Compuware arising from her employment or its termination. Finally, Compuware's internal documents, including an "Employee Status Change Form" listed the termination of Buff's employment as "involuntary." These factors, taken together, amount to substantial evidence supporting the trial court's conclusion that Buff's employment was about to be terminated for cause.

We recognize that the trial also included some evidence that might support the conclusion that Buff's employment was terminated for the company's convenience rather than for cause. For example, Buff stated that Doug Barre did not *directly* tell her that she was about to be fired. There were some earlier discussions regarding whether Buff would consent to a move to Detroit, and whether the company might have a position for her there. Buff also testified that she felt she had been doing a very good job, and that none of her superiors had contradicted that view.

Although some evidence might have supported a conclusion different from that reached by the trial court, under all of the evidence in the case, the trial court was entitled to infer that Buff was about to be fired for cause. The court could therefore conclude that the severance payments resulted not from a prior contractual obligation, but from the company's new decision to avoid potential litigation. This trial involved many issues of credibility (especially the credibility of Buff's testimony) which are particularly within the province of the trier of fact. Although a contrary conclusion could have been reached, substantial evidence on this record supports the trial court's conclusion.

From this factual conclusion that Buff was about to be terminated for cause (without any severance pay), it follows that the right to severance pay was acquired not during the marriage, but at the time of Buff's signing of the new release of legal claims and her new agreement not to work for Compuware's primary competitors for three years. Because the right to severance pay was acquired after the parties separated, the trial court did not err in awarding the severance pay to Buff as her separate property.

## B. *Stock Options*

■ Buff received stock options as part of her executive bonus package during her employment with Compuware. As noted earlier, under the arrangement at the time Buff left Compuware, Buff's stock options continued to vest through November 10, 1998.

The trial court concluded that the stock options included both separate and community property, and that the time rule was appropriate for ascertaining the community's interest. ■ When a trial court concludes that property contains both separate and community interests, the court has broad discretion to fashion an apportionment of interests that is equitable under the circumstances of the case. (*In re Marriage of Gowan* (1997) 54 Cal.App.4th 80, 88 [62 Cal.Rptr.2d 453].) "[T]he disposition of marital property is within the trial court's discretion, by whatever method or formula will 'achieve substantial justice between the parties.' " (*In re Marriage of Hug* (1984) 154 Cal.App.3d 780, 791-792 [201 Cal.Rptr. 676, 46 A.L.R.4th 623] ["[N]o single rule or formula is applicable to every dissolution case involving employee stock options. Trial courts should be vested with broad discretion to fashion approaches which will achieve the most equitable results under the facts of each case"]; see also *In re Marriage of Walker* (1989) 216 Cal.App.3d 644 [265 Cal.Rptr. 32].) Consequently, we review the trial court's utilization of the time rule to divide the stock options here under an abuse of discretion standard. (See *In re Marriage of Adams* (1976) 64 Cal.App.3d 181, 187 [134 Cal.Rptr. 298].)

■ Generally, under the time rule, the community is allocated a fraction of the benefits, the numerator representing length of service during marriage but before separation, and the denominator representing the total length of service by the employee spouse. That ratio is then multiplied by the total benefit received to determine the community interest. (See *In re Marriage of Gowan, supra*, 54 Cal.App.4th 80, 88.)

■ In this case, the parties agreed that some use of the time rule as set forth in *In re Marriage of Gowan, supra*, 54 Cal.App.4th 80, was appropriate, but disagreed regarding the denominator to be used in the fraction. In essence, Buff argued that the one-year period from her November 10, 1997 termination through November 10, 1998, should count as part of the denominator of the time rule fraction, so that for any stock option in question, the numerator would be the date of grant to the date of marital separation, and the denominator would be the date of grant to the date of vesting of that option. James argued that the period after Buff's departure from Compuware did not represent any actual service to Compuware, and therefore should not be counted in the denominator of the time rule fraction. James argued that November 10, 1997 (Buff's actual departure date from Compuware) should be used as the ending date for the denominator of the fraction.

The trial court adopted the calculations set forth in Buff's trial brief, exhibit D, as the correct calculation. By adopting this calculation, the court held that the one-year period from Buff's November 10, 1997, termination through November 10, 1998, would count as part of the denominator of the time rule fraction that determined the community's interest in the stock options. Using this method, the shares that vested after Buff left Compuware were divided as follows: For 6000 shares (after stock splits) that vested on June 1, 1998, the fraction was 36.7 months (May 25, 1994 grant to June 14, 1997 marital separation) divided by 48.2 months (May 25, 1994 grant to June 1, 1998 vesting) or 76.1 percent community property. For 80,000 shares (after stock splits) that vested on October 25, 1998, the fraction was 19.6 months (October 25, 1995 grant to June 14, 1997 marital separation) divided by 36 months (October 25, 1995 grant to October 25, 1998 vesting) or 54.4 percent community property.

On appeal, James contends, as he did at trial, that the period after Buff's departure from Compuware should not be counted in the denominator of the time rule fraction. Under the calculations advocated by James, the denominator would always end with November 10, 1997 (Buff's departure date). As a result, according to James, the community property would include approximately 88.22 percent of the 6,000 options that vested on June 1, 1998, and 80.05 percent of the 80,000 shares that vested on October 25, 1998. James

bases his contention regarding the proper application of the time rule to the stock options on both factual and legal grounds.

As a factual matter, James argues that Buff was not employed at Compuware or rendering any services to Compuware from November 10, 1997, forward. The stock options were simply the result of Buff's employment, which ended on November 10, 1997, and utilizing any "fictive" later time as the end of Buff's service would be unfair to the community's interest.

The trial court disagreed with James's factual argument. The trial court found that the extra year of stock option vesting was not derived from anything earned during the marriage, because the parties had absolutely no right to have stock options vest after the termination of Buff's employment. Under Buff's employment contract, she would have no right for stock options to continue to vest after any termination for cause. The court stated: "The stock options were subject to forfeiture on termination, and were also part of the negotiation that [Buff] was able to evolve with Compuware. There was an extreme danger of forfeiture." The court found that the continued vesting of stock options was a right granted only as part of a severance package, in settlement of Buff's potential postseparation claims against the company.

For the reasons outlined in part II.A of this opinion, we are persuaded that substantial evidence in the record supports the trial court's factual finding that the stock options, like the severance pay, were part of a "new deal" entered at the time Buff's employment was terminated.

James's primary legal argument is that this case is controlled by *In re Marriage of Lehman* (1998) 18 Cal.4th 169 [74 Cal.Rptr.2d 825, 955 P.2d 451] (*Lehman*). In *Lehman*, a husband was offered enhanced retirement benefits to encourage him to elect early retirement with his employer. This offer came after the husband's marital separation. Part of the enhanced retirement benefit was the crediting of three putative years of service. In calculating the community portion of his retirement benefit, the husband argued that the three putative years of service should be included in the denominator of the time rule fraction. Both the trial court and the appellate court rejected this argument, and the Supreme Court affirmed. The Supreme Court stated: "Such years are fictive—they have no independent existence, but are merely the means by which the employer effects the enhancement." (*Id.* at p. 188, italics omitted.) Because Mr. Lehman was not rendering services to his former employer during those three years, the court considered the enhancement merely a part of the existing retirement benefits which were contracted for during marriage. The putative years of service were not

added to either the numerator or the denominator of the time rule fraction. (*Ibid.*)

James argues that *Lehman, supra,* 18 Cal.4th 169, is controlling here, and that Buff's putative year of service (for which she received both salary and stock option vesting) was similar to Mr. Lehman's. James argues that Buff's "fictive" year, like the putative years of service in *Lehman,* should not be added to either the numerator or the denominator of the time rule fraction.

We are not persuaded that *Lehman, supra,* 18 Cal.4th 169, applies to the severance package at issue in this case. In *Lehman,* the court emphasized that the enhancement at issue "was not a severance payment either in name or in nature. It called itself, and was in fact, an *increase in retirement benefits.*" (*Id.* at p. 186.) The trial court in this case was not bound to apply *Lehman* mechanically in circumstances that were explicitly found to be different. *Lehman* involved an enhancement to retirement benefits based on the number of years of service, where part of the service occurred during marriage. Under those facts, the court held that the enhancement was partially community property. Here, in contrast, Buff was allowed to receive vesting of the stock options in question not based on her prior service with Compuware, but because she entered a "new deal" with her employer *after* the date of the marital separation. The options in question were not the result of Buff's original contract or her prior years of service, but part of a separate, new severance package. Buff had not previously accrued any right whatsoever to this payment. Under these circumstances, the court was within its discretion to apply the time rule in a manner that gave Buff the benefit of these stock options.

James also argues that the trial court violated *Lehman*'s pronouncement that the issue of characterization of property as community or separate property "does not turn on the motive of the employer. In any context, motive is, at best, hard to discern. [Citation.] In this context, it is also 'irrelevant.' [Citation.] That is because the employer acts for its own business reasons, and not for reasons bearing on the characterization of property for employee spouses and nonemployee spouses. [Citation.]" (*Lehman, supra,* 18 Cal.4th at p. 180.)

We are not persuaded that the trial court here was attempting to determine Compuware's motive. Instead, the trial court focused on whether Buff's right to severance pay came from (1) the employment agreement signed during marriage, or (2) a new right created after the marital separation. We find no violation of the principles set forth in *Lehman, supra,* 18 Cal.4th 169, in the trial court's determination that the posttermination vesting of stock options represented a new right created after the marital separation.

James argues that Buff could not create a "new right" just by waiving her right to a wrongful termination suit. James argues that if such a waiver can create a new separate property right, this argument can be made in nearly every case where an individual faces termination, creating an exception that will swallow the rule. We are not persuaded that the circumstances here will necessarily apply in every case. Here, there was specific evidence that Buff's employment might be terminated for cause, Buff had no right to salary continuation or stock option vesting after termination, and she relinquished certain specific future employment opportunities and a potential lawsuit in order to acquire the salary and stock options. The trial court did not err in its disposition of the new rights acquired by Buff as a result.

James also argues that Buff "concedes that her rights were, in fact, a continuation of pre-separation rights." (Capitalization omitted.) We disagree. In her appellate brief, Buff states that if she had known this dispute would arise, she could have had the company "label what they were doing as a new grant of shares to her" rather than as a continuation of her earlier vesting rights. The question here is not what the company could or might have done, but how to characterize the property that *was* actually given to Buff by the company. We do not view Buff's comment regarding other possibilities as a concession regarding the character of the assets she did receive.

Finally, James contends that Buff's stock options were a right derived from her employment during marriage, and subsequent facts could change the *amount*, but not the community property *character*, of the stock options. He also argues that Buff engaged in a "post-separation effort to enhanced pre-separation rights." The trial court, however, held that the stock options in question (which vested after Buff's employment was terminated) were *not* a right derived from Buff's employment during marriage. Instead, they were a new right which did not exist before the parties were separated. In light of the substantial evidence supporting the trial court's factual conclusions, we find no abuse of discretion in the trial court's legal determination or calculations regarding the stock options at issue.

### C. The Diamond Ring

The third issue on appeal is the court's ruling regarding the diamond ring. It is undisputed that the diamond was purchased approximately five years after the marriage with community funds. The parties' dispute concerns the application of Family Code section 852 (section 852). That section provides, in pertinent part: "(a) A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the

property is adversely affected. [¶] . . . [¶] (c) This section does not apply to a gift between the spouses of clothing, wearing apparel, jewelry, or other tangible articles of a personal nature that is used solely or principally by the spouse to whom the gift is made and that is not substantial in value taking into account the circumstances of the marriage."

At trial, James argued that the ring was community property, because it was substantial in value taking into account the circumstances of the marriage, and because no valid written transmutation (as required by § 852) had been made. Buff argued that a written transmutation was not required for gifts of jewelry, and that as a result of the gift, the ring became her separate property.

The trial court found that the ring was Buff's separate property. The trial transcript includes the trial court's finding that the ring was substantial in value taking into account the circumstances of the marriage.[3] In its statement of decision, the trial court stated as follows: "[James] purchased a diamond of substantial value using community funds and unilaterally gave it [to Buff] at or about the time of their fifth wedding anniversary as a gift, with a card announcing his congratulations. Prior to the presentation of this gift, [James] had the stone mounted in a gold setting configured in a ring for [Buff] to wear. [Buff] understood the ring and stone to be a gift to her and accepted it as such. [James] never, prior to separation, stated that the ring and stone were purchased as an investment, rather than a gift, as he now contends. On this issue, the court finds the testimony of [Buff] credible and the testimony of [James] not to be credible. Furthermore, there was no evidence that [Buff] was involved in the purchase or setting of the stone and ring. [¶] The credible evidence here was that the stone was put in a women's ring and used exclusively by [Buff], consistent with both the statute and the intent described above. Although the writing accompanying the gift did not satisfy the requirement of Family Code § 852(a), the court nevertheless finds that the ring was a 'true gift' and as such, it is the separate property of the recipient, Family Code § 770(a)(2) and § 850, and 852; cases cited in Hogoboom & King, California Practice Guide: Family Law (The Rutter Group, 1999)."

---

[3]The trial transcript includes an exchange in which the attorney for James reads from Buff's prior testimony. He had asked Buff, "Okay, in regards to the ring Mr. Steinberger was testifying to yesterday, did you understand when you received that ring that it had some substantial value to you?" and Buff answered, "Yes, I did." She confirmed that after the bill came, she had the understanding that the ring was worth "a range of at least" $13,000 or $14,000. After this testimony was reread to the trial court, the court stated: "Just a minute. This refreshes my recollection about the value and [Buff's] concession, that even from the amount of money they had, it was substantial, and I think, accordingly, it would be appropriate for me to say that the ring, or the stone, was of substantial value even taking into account the circumstances of the marriage."

On appeal, James argues that the trial court erred, because "the plain meaning of section 852 is that if the gift between spouses consists of a substantial asset, it is not going to [be] held to be a gift unless there is a written expressed declaration transmuting the property from community to separate. There was not, in this case, such a sufficient writing."

We agree with James's interpretation of the statute. The statute specifically provides that a transmutation is "not valid unless" there is a sufficient writing. (§ 852, subd. (a).) The trial court found that the writing here (a card presented to Buff) was not sufficient. The statutory exception for jewelry applies only to a gift that is "not substantial in value taking into account the circumstances of the marriage." In her appellate brief, Buff has not argued that the evidence was insufficient to support the trial court's finding that the ring was substantial in value taking into account the circumstances of the marriage, or that the trial court's factual finding was erroneous. With regard to a substantial gift, the statute simply does not provide for implied or oral transmutations made without a sufficient writing.

We recognize that this statute, with its bright-line test regarding transmutations, may seem harsh in light of the informal, everyday practices of spouses making gifts during a marriage. In enacting section 852, however, the Legislature made a policy decision balancing competing concerns. When the rule now codified in section 852 was being considered, the Law Revision Commission stated as follows: "California law permits an oral transmutation or transfer of property between the spouses notwithstanding the statute of frauds. This rule recognizes the convenience and practical informality of interspousal transfers. However, the rule of easy transmutation has also generated extensive litigation in dissolution proceedings. It encourages a spouse, after the marriage has ended, to transform a passing comment into an 'agreement' or even to commit perjury by manufacturing an oral or implied transmutation. [¶] The convenience and practice of informality recognized by the rule permitting oral transmutations must be balanced against the danger of fraud and increased litigation caused by it. The public expects there to be formality and written documentation of real property transactions, just as it expects there to be formality in dealings with personal property involving documentary evidence of title, such as automobiles, bank accounts, and shares of stock. Most people would find an oral transfer of such property, even between spouses, to be suspect and probably fraudulent, either as to creditors or between each other. [¶] California law should continue to recognize informal transmutations for certain personal property gifts between spouses, but should require a writing for a transmutation of real property or other personal property. In the case of personal property 'gifts' between the spouses, gifts of most items such as household furnishings and appliances should be presumed community and gifts of clothing,

wearing apparel, jewelry, and other tangible articles of a personal nature should be presumed separate (unless large or substantial in value). These presumptions most likely correspond to the expectations of the ordinary married couple." (Recommendation Relating to Marital Property Presumptions and Transmutations (Sept. 1983) 17 Cal. Law Revision Com. Rep. (1984) pp. 205, 213-214, fns. omitted.)

Section 852, as enacted, makes it clear that the Legislature chose to balance the various policy concerns (allowance for convenience and informality within marriages, while preventing or minimizing disputes, fraud and perjury) by enacting a clear, bright-line test regarding transmutations of property. In light of the Legislature's decision and the clear language of the statute, it would be inappropriate to hold that a transmutation of jewelry that was substantial in value taking into account the circumstances of the marriage occurred here without the writing required by section 852.

The trial court apparently relied in part on a section in the treatise, Hogoboom and King, California Practice Guide: Family Law (The Rutter Group 1999). Paragraph 8.510 of that treatise states: "**Gifts between spouses**: Either spouse can, by making a gift to the other, convert his separate property or interest in community property into the other spouse's separate property. [¶] (1) [8:511] **Formalities**: If the issue is one of post-1984 transmutation, an 'express written declaration' stating characterization or ownership is being changed will be required [citation]. Presumably, however, true 'gifts' can still be proved by evidence of the ordinary elements of a gift—i.e., *delivery* and *donative intent*. [See, e.g., *DeBoer v. DeBoer* (1952) 111 Cal.App.2d 500, 244 P.2d 953; *Gudelj v. Gudelj* (1953) 41 C[al.]2d 202, 259 P.2d 656]." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶¶ 8:510 to 8:511, p. 8-134.1 (rev. #1 2001).)

In light of the clear language of section 852, this comment is only partially correct. The cases cited are not persuasive with regard to gifts of jewelry that are substantial in value, taking into account the circumstances of the marriage, because they precede the enactment of the rule now codified as section 852. Under the clear statutory provision of section 852, gifts of personal property that are substantial in value taking into account the circumstances of the marriage will not be considered converted to separate property without the writing required by section 852.

Because no valid written transmutation was made in this case, the trial court erred in holding that the diamond ring was Buff's separate property. Pursuant to section 852, the ring should be considered community property.

## DISPOSITION

In light of our conclusion that the diamond ring should be considered community property, the judgment is reversed, and the matter is remanded for the limited purpose of reconsidering the division of the parties' community property. Each party shall bear his or her costs on appeal.

Bamattre-Manoukian, J., and Wunderlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 14, 2001.