Filed 2/25/25  Madatyan v. Torosian CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ELDA MADATYAN, | B332420 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STFL12033) |
| v. | |
| AKOP TOROSIAN, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Bradley S. Phillips, Judge.  Reversed.

Mazur & Mazur and Janice R. Mazur for Plaintiff and Appellant.

Akop Torosian, in propria persona, for Defendant and Respondent.

_____

As part of their divorce, appellant Elda Madatyan and respondent Akop Torosian entered into a stipulated judgment.[1] In pertinent part, this stipulated judgment provided that: (1) Elda would pay Jack $2,300,000 to buy out his interest in five bakeries the couple owned; (2) while any portion of the $2,300,000 remained unpaid, Elda would pay Jack $40,000 a month as part of his share of the profits from the bakeries; (3) the parties were to sell a house known as the Rimcrest Property that was held solely in Jack's name; and (4) after repayment of a Small Business Administration loan from the proceeds of that sale, Elda's 50 percent share of the "net proceeds" from the sale would be given to Jack as part of the $2,300,000 Elda was to pay him. While "net proceeds" was undefined, the stipulated judgment described it as an amount "after sales costs, taxes, etc."

The issue before us is whether the term "taxes" includes capital gains taxes—in other words, whether the capital gains taxes associated with the sale were to be deducted from the gross proceeds before crediting Elda with her half of the net proceeds. In a March 2023 request for order, Jack contended that such a deduction was required; Elda disagreed. The significance of the dispute is that, if Elda was correct, by July 2022, she had paid Jack more than the $2,300,000 she owed him and thereby extinguished the obligation to continue making monthly payments of $40,000. If Jack was correct, Elda had not paid the full $2,300,000 and owed Jack not only the balance of that debt, but also the monthly $40,000 payments she had not made since July 2022.

---

[1] Because the stipulated judgment refers to the parties as "Elda" and "Jack," we do the same.

In granting Jack's request for order, the trial court agreed with Jack and ordered Elda to pay Jack $90,986 on the $2,300,000 debt, and an additional $440,000 for 11 months of missed $40,000 payments. We conclude the trial court erred and therefore reverse. We also deny Jack's request that we dismiss this appeal under the disentitlement doctrine.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *The Court Enters a Stipulated Judgment*

Elda and Jack married in January 2012. In November 2020, Elda filed for divorce. In October 2021, Elda and Jack obtained a "Bifurcated Judgment of Dissolution – Status Only." In March 2022, the parties signed a " 'Deal Memo' that resolved all issues incident to this dissolution proceeding." In June 2022, the parties agreed on a 42-page stipulated judgment contemplated in this "Deal Memo." The stipulated judgment was intended to resolve "all present and future property rights of every kind and nature whether relating to community property, quasi-community property, or separate property, reimbursement claims, . . . and known claims either Party may have or claim to have against the other."

Section 7.1.3.1 of the stipulated judgment awarded Elda 100 percent interest in five bakeries that were previously community property. Section 7.1.3.4 provided that Elda "shall pay JACK the sum of $2,300,000 as and for a buyout of his share of the Bakeries" as a "tax free payment to JACK incident to the dissolution of marriage pursuant to *Internal Revenue Code*

---

[2] We limit our summary to the facts and procedural history relevant to the issues raised on appeal.

§ 1041." The section further provided that Elda "shall be entitled to receive all net profits in connection with the Bakeries except that she shall pay JACK the sum of $40,000 per month as and for his share of the earnings of the Bakeries until she pays off the $2,300,000 in its entirety as set forth herein."[3] The obligation to make $40,000 monthly payments would start in March 2022, and the payments were due on the last day of every month.

Section 7.3 provided that Elda would "assume and promptly pay when due all obligations, debts and liabilities" relating to "[a]ny and all debts in connection with the Bakeries, including but not limited to, SBA Loan x900, SBA Loan x7900, SBA Loan x7901, and SBA Loan x7902" and relating to "[o]ne-half (1/2) of the SBA Loan in connection with the Gym, including any interest thereon."[4] Section 7.3.2 further provided that the Gym's SBA loan "is to be paid from the sale of the Rimcrest Property."

Section 7.6 addressed the "Rimcrest Property," a house held solely in Jack's name and encumbered by a mortgage also solely in Jack's name. The house was to be sold immediately and "[t]he net sales proceeds of the Rimcrest Property shall be awarded to JACK subject to the repayment of the SBA Loan for the Gym." Section 7.6.6 elaborated that, after the repayment of the SBA loan, "ELDA's community property share of the remaining net proceeds [from the] sale shall be awarded to JACK" and "applied to the $2,300,000 debt she owes JACK for his interest in the

---

[3] Although the judgment did not expressly specify, it does not appear that the $40,000 monthly payments would count toward the $2,300,000 payment.

[4] The "Gym" was a North Hollywood business awarded solely to Jack.

4

Bakeries." The section then provided an example that "if the Parties realize net proceeds (after sales costs, taxes, etc.) of $1,000,000 from the sale of the Rimcrest Property and the SBA Loan for the Gym is $150,000, then the $150,000 shall be paid off first, the remaining $850,000 shall be awarded to JACK as his sole and separate property, and the $2,300,000 debt ELDA owes to JACK for his interest in the Bakeries shall be reduced by $425,000 to $1,875,000." Section 7.6.7 added that "ELDA and JACK shall each be responsible for one-half (1/2) of any capital gains or other tax liability associated with the sale of the Rimcrest Property."

Section 7.8 addressed the "Acton Property," a house held solely in Elda's name. As with the Rimcrest Property, the Acton Property was to be sold immediately and the "net sales proceeds" were to be "evenly divided between ELDA and JACK" subject to certain other parties' "documented rights to reimbursement." Elda's "one-half (1/2) share of the net proceeds from the sale of the Acton Property shall be paid to JACK and ELDA's $2,300,000 payment owed to Jack for the bakeries shall be reduced accordingly." Finally, "JACK and ELDA shall each be responsible for one-half (1/2) of any capital gains or other tax liability associated with the sale of the Acton Property."

Section 15.3 provided that "Except as otherwise set forth herein, the transfers made pursuant to this Stipulated Judgment on Reserved Issues are incident to dissolution of marriage and are made pursuant to *Internal Revenue Code* § 1041" and that "transfers made pursuant to Internal Revenue Code § 1041 are tax-free to ELDA and JACK."

Section 15.6 provided that "Each Party is ordered to prepare and file all federal and state income tax returns on a

5

basis consistent with the terms of this Stipulated Judgment on Reserved Issues."

The court issued the stipulated judgment in June 2022.

### B. *Jack Claims Elda Still Owes Him Money and Requests an Order*

#### 1. Request for Order

In March 2023, Jack requested that the court order Elda to "pay off the SBA loans awarded to her" in section 7.3.1 of the judgment and pay Jack the remainder of the $2,300,000 as well as the monthly $40,000 payments that were due as long as the $2,300,000 was not fully paid. Jack claimed Elda had failed to pay $124,223 of the $2,300,000 owed to him and had paid him nothing since July 2022. Jack asserted he was therefore additionally entitled to $40,000 a month from July 2022 to March 2023, for a total of $484,223. Jack also requested sanctions in the amount of $250,000.

#### 2. Opposition

In June 2023, Elda filed an opposition to Jack's request for order, contending that she had already paid him more than the $2,300,000 owed. Specifically, she claimed that she paid Jack $1,200,000 on July 12, 2022; $245,000 on July 15, 2022; and $288,147 on July 29, 2022, for a total of $1,733,147. She additionally claimed that on April 7, 2022, she assigned to Jack the $616,684.85 that constituted her portion of the proceeds from the Rimcrest Property sale, and that on July 26, 2022, she assigned to him the $95,777.93 that constituted her portion of the proceeds from the Acton Property sale. Thus, Elda claimed she had already paid Jack a total of $2,445,609.78.

6

Among the documents supporting her claims was a "Seller's Final Closing Statement" from the escrow company for the Rimcrest Property sale, which contained two columns: Credit and Debit.  The Credit side listed the $2,900,000 sales price, $4,025.66 in "County Taxes" (to reimburse taxes already paid from the date of closing to July 1, 2022), and a $125 escrow courtesy credit, for a total of $2,904,150.66.  The Debit side listed various payoffs, charges, and fees (including "Documentary Transfer Tax" and "Property Taxes") totaling $1,670,780.95.  The closing statement—which listed the "Seller" as Jack—concluded that $1,233,369.71 (i.e., $2,904,150.66 minus $1,670,780.95) was "Due to seller."  Half of $1,233,369.71 is the $616,684.85 that Elda claimed was her portion of the proceeds.

In a latter portion of her opposition, she claimed that $150,000 was owing on the SBA loan relating to the Gym, and that her half of that loan was paid from the proceeds of the Rimcrest Property sale.[5]  As for the remaining SBA loans, Elda claimed that she could not make any payments without Jack's written authorization and executed power of attorney, which he "was reluctant to provide."

---

[5] Thus, while Elda did not expressly make this calculation, by her logic, she was essentially contending that the proceeds from the Rimcrest Property sale reduced the $2,300,000 she owed Jack by $541,684.85 ($1,233,369.71 (proceeds) minus $150,000 (SBA loan payoff) divided by two), not $616,684.85.  However, even with the $541,684.85 figure, the sum of Elda's payments and credits totaled $2,370,609.78 (i.e., more than $2,300,000).

7

### 3. Reply

In Jack's reply to Elda's opposition, he admitted to receiving the cash payments Elda listed[6] and agreed $95,777.50[7] from the sale of the Acton Property should be credited toward the $2,300,000 payment owed. However, as to the Rimcrest Property, while he agreed the "Sale Proceeds" were $1,233,369, and $150,000 should be deducted from that amount to repay the Gym's SBA loan, he contended there needed to be a further deduction for "taxes" to calculate "net proceeds." Specifically, he argued an additional $323,242 should be deducted from the sales proceeds to account for "state and federal taxes," meaning the "net proceeds" were $760,127.[8] Jack claimed that Elda should receive credit for only half that, or $380,063.50, meaning that Elda still owed him $90,986 on the $2,300,000 debt, and the obligation to make monthly $40,000 payments was never extinguished.[9]

---

[6] Elda claimed she had paid him a total of $1,733,147; Jack appears to have erroneously transposed the "4" and "7," as he acknowledged receiving $1,733,174.

[7] Because Jack mostly used whole numbers, he claimed Elda should receive a credit of $95,777.50 instead of the $95,777.93 that Elda claimed.

[8] $760,127 is equal to $1,233,369 (sale proceeds) minus $150,000 (Gym SBA loan) minus $323,242 (amount Jack claims is owed for capital gains taxes).

[9] While we note that there are minor arithmetic errors in Jack's calculations—perhaps attributable to his use of round and whole numbers—because the exact dollar amounts are not germane to the outcome of this appeal and no one has objected to the errors, we do not address them.

As support for his claim that $323,242 was the amount owed for "state and federal taxes," Jack attached a series of emails he sent to Elda's lawyers, in which he set forth the amounts he believed were still owed to him. He also attached four tax documents: First, he attached Internal Revenue Service Form 8960 (Net Investment Income Tax) for Tax Year 2021, listing a taxable gain of $980,000 and a "Net investment income tax" of $32,490. Second, he attached the second page of IRS Form 1040 for Tax Year 2021. Line 37 of that form—"Amount you owe"—states that Jack owed a total of $219,836 in taxes. The document also stated that the "Preparer's name" was "SELF PREPARED." Third, he attached page 5 of IRS "Federal Worksheets" from Tax Year 2021, calculating the taxable gain from the Rimcrest Property and stating that his "Gain . . . on the sale" was $1,230,000.[10] By subtracting a $250,000 exclusion from $1,230,000, Jack arrived at a taxable gain of $980,000. Finally, he attached an undated page from what appears to be page 3 from the Franchise Tax Board's Form 540, stating that his "Tax due" was $103,406.[11]

As to the SBA loans, Jack claimed he was not made aware until late May 2023 that a power of attorney was required, and that he had since sent a notarized power of attorney to Elda's counsel.

---

[10] While the worksheet does not specifically state it is for the Rimcrest Property, the figure given for the "Selling price of home" matches the sale price on the Seller's Final Closing Statement. Additionally, the $1,230,000 listed for the "Gain . . . on the sale" is very close to the $1,233,369.71 that the Seller's Final Closing Statement stated was due to Jack.

[11] $219,836 plus $103,406 equals $323,242.

### 4. Sur-reply

In a court-permitted sur-reply, Elda argued that "taxes" in the phrase "net proceeds (after sales costs, taxes, etc.)" referred to property taxes, not capital gains or other personal tax obligations. Elda pointed out the numerous sections in the stipulated judgment that stated each party would be responsible for their own taxes. Elda additionally argued the tax documents Jack provided did not support his claim because "there is no description of what the figures in [those documents] represent, how they were arrived at, whose share they represent or what information was used to compile the figures contained therein." Elda contended she had overpaid Jack by $70,609.78 and, for the first time, asked the court to order Jack to reimburse her for this amount.

### 5. Supplemental Declaration

After Elda's sur-reply, Jack filed a supplemental declaration stating, in relevant part: (1) taxes needed to be deducted from the proceeds of the Rimcrest Property because the property was in his name only "and the sale is reported only in my name to the taxing authorities"; and (2) the amount of the tax liability "was calculated by Levon Filian, CPA, the same CPA who Petitioner uses for her personal and business taxes, and who has prepared our separate returns for over 10 years." Elda moved to strike this declaration on the grounds that the court had expressly denied his request to file it.[12]

---

[12] The record does not reveal how or if the court ruled on Elda's motion to strike.

10

### 6. Court Ruling

In late June 2023, the court granted Jack's request for order. It concluded that "state and federal capital gains taxes must be deducted from the proceeds of the sale of the Rimcrest property before Petitioner's 50% share of the 'net proceeds' from such sale is credited against Petitioner's obligation to pay $2.3 million to Respondent." The court pointed out that the stipulated judgment expressly provided that each party would be responsible for one-half of any capital gains or other tax liability associated with the sale of the Rimcrest Property, and that "the example in section 7.6.6 shows that 'net proceeds' is the amount remaining 'after sales costs, *taxes*, etc.'" Given these provisions, the court stated that "[w]ere Petitioner credited with 50% of the sale proceeds *before* capital gains taxes, Respondent would effectively be paying Petitioner's share of the capital gains taxes, because it is undisputed that the gain from the sale would be reported only on Respondent's separate tax return."

Based on this reasoning, the court concluded Elda still owed Jack $90,986 on the $2,300,000 due, and therefore the obligation to pay him $40,000 monthly had never ended. The court ordered Elda to pay Jack $530,986, consisting of the $90,986 still owing and $40,000 per month for eleven months.

Elda timely appealed.

### DISCUSSION

It is undisputed that if $323,242—the amount Jack claimed he owed in capital gains taxes—were deducted from the proceeds of the Rimcrest Property sale before crediting Elda with 50 percent of the remaining amount, Elda did not pay Jack the full $2,300,000. It is also undisputed that if capital gains taxes were

11

not deducted from the sale of the Rimcrest Property before crediting Elda with 50 percent of the proceeds, Elda paid Jack more than $2,300,000. The trial court concluded that the stipulated judgment required $323,242 to be deducted from the Rimcrest Property sale proceeds before crediting Elda 50 percent of the remaining amount, and that she therefore owed Jack the difference, plus $440,000.

Elda contends the trial court erred because: (a) the stipulated judgment did not require the deduction of capital gains taxes from the Rimcrest Property sale proceeds before crediting her with 50 percent; (b) substantial evidence does not support Jack's claim that he owed $323,242 in capital gains taxes; and (c) assuming Elda still owed Jack some amount of the $2,300,000, requiring her to pay him an additional $440,000 constituted an unfair penalty. Because we conclude the court erred in interpreting the stipulated judgment to require the deduction of capital gains taxes from the Rimcrest Property sales proceeds before crediting Elda with 50 percent, we need not address her other arguments.

The trial court articulated two reasons for its conclusion that capital gains taxes were to be deducted from the Rimcrest Property sale proceeds before crediting Elda with 50 percent. First, the trial court reasoned, because it was "undisputed" the sale would be reported only on Jack's tax return, and because the stipulated judgment provided that each party would pay half the capital gains taxes owed on the transaction, splitting the sales proceeds before deducting the capital gains taxes owed would result in Jack paying all the capital gains tax. Second, the court noted that "the example in section 7.6.6 shows that 'net proceeds'

12

is the amount remaining 'after sales costs, *taxes*, etc.' " We address each reason in turn.

### A. *Nothing Supports the Conclusion the Gain From the Sale Would Be Reported Only on Jack's Separate Tax Return*

The trial court stated it was "undisputed that the gain from the sale would be reported only on [Jack]'s separate tax return." The court did not explain how it arrived at this conclusion, and we find no support for it either in the language of the stipulated judgment or in the appellate record.

### 1. The Stipulated Judgment Required Jack to Prepare Tax Returns Stating He Received Half the Proceeds

"The same rules apply in ascertaining the meaning of a court order or judgment as in ascertaining the meaning of any other writing. [Citation.] 'The interpretation of the effect of a judgment is a question of law within the ambit of the appellate court.' " (*Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1205.) We therefore review the trial court's interpretation of the stipulated judgment de novo. (See *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 713.)

Section 7.6.6 of the stipulated judgment provided that after the Rimcrest Property was sold and the Gym's SBA loan was repaid from the proceeds, "ELDA's community property share of the remaining net proceeds [from the] sale shall be awarded to JACK" and would be "applied to the $2,300,000 debt she owes JACK for his interest in the Bakeries." Section 7.6.7 added that "ELDA and JACK shall each be responsible for one-half (1/2) of

13

any capital gains or other tax liability associated with the sale of the Rimcrest Property."

These provisions make clear that Jack was to receive half the net proceeds from the sale of the Rimcrest Property and would separately be responsible for half the capital gains taxes associated with the sale. Like Jack, Elda would also receive half the net proceeds and be responsible for half the taxes, but she agreed that she would transfer her portion of the proceeds back to Jack as partial payment on the $2,300,000 she owed him.

The stipulated judgment further stated that "Each Party is ordered to prepare and file all federal and state income tax returns on a basis consistent with the terms of this Stipulated Judgment on Reserved Issues." In other words, Jack was required to inform the IRS that he received half the proceeds from the sale and would be responsible for half the taxes—Elda's transfer to him of an amount equivalent to the other half of the proceeds was simply a partial payment of the $2,300,000 she owed him.[13]

### 2. Substantial Evidence Does Not Support the Court's Conclusion the Sale Was Reported Only on Jack's Return

To the extent the court based its finding on evidence submitted by the parties, "[w]e review the trial court's factual

---

[13] If Elda's transfer of her proceeds to Jack did result in Jack somehow being assessed additional capital gains taxes relating to the sale of the Rimcrest Property, given the parties' agreement that they would each be responsible for half the capital gains taxes associated with that sale, Jack could request reimbursement from Elda pursuant to section 7.6.7.

14

finding to determine whether it is supported by substantial evidence." (*In re Marriage of Steinberger* (2001) 91 Cal.App.4th 1449, 1458.)

The only evidence we find in the appellate record relating to how the Rimcrest Property sale was or would be reported to the relevant tax authorities are the tax documents Jack used to support his claim that he owed or would owe $323,242 in capital gains taxes relating to the sale. While the "Federal Worksheets" document indicates that Jack received the entire $1,230,000 of net proceeds from that sale, these documents are unsigned, appear to be self-prepared, and contain no evidence they were ever filed. Further, the sale of the Rimcrest Property occurred in 2022, and the tax documents are either for Tax Year 2021 or are undated.[14] These documents do not constitute substantial evidence that income from the sale of the Rimcrest Property would be reported solely on Jack's tax return and are certainly not evidence that such a "fact" is "undisputed."

---

[14] Jack claims in his appellate brief that these four pages were "prepare[d] by [Elda's] own accountant, Levon Filian" and that he "filed the tax documents, which clearly show it [*sic*] was prepared by Mr. Filian, on June 9, 2023, as part of his Reply Declaration." It is unclear if Jack is claiming that he filed these pages with the relevant tax authorities, or just with the trial court. However, three of the four pages do not indicate who prepared them, and the one page that does contain such an indication lists the "Preparer's name" as "SELF PREPARED."

**B.** ***The Stipulated Judgment Does Not Require the Deduction of Capital Gains Taxes to Arrive at "Net Proceeds"***

Section 7.6.6 of the stipulated judgment provided an example of what was to occur to the proceeds from the sale of the Rimcrest Property after the repayment of the Gym's SBA loan: "if the Parties realize net proceeds (after sales costs, taxes, etc.) of $1,000,000 from the sale of the Rimcrest Property and the SBA Loan for the Gym is $150,000, then the $150,000 shall be paid off first, the remaining $850,000 shall be awarded to JACK as his sole and separate property, and the $2,300,000 debt ELDA owes to JACK for his interest in the Bakeries shall be reduced by $425,000 to $1,875,000."[15] The trial court interpreted the parenthetical inclusion of "taxes" in the example to mean that capital gains taxes needed to be deducted from the gross proceeds to arrive at "net proceeds." We disagree.

" 'Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative or meaningless.' " (*State Comp. Ins. Fund v. Department of Ins.* (2023) 96 Cal.App.5th 227, 237; see also Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"].) Here, section 7.6.6 of the stipulated judgment provided that Elda's half of the "net proceeds" would be given to Jack as payment toward the $2,300,000 she owed him. If the net proceeds were calculated by deducting the capital gains taxes from the gross proceeds, there would be no need for section

---

[15] $425,000 is 50 percent of $850,000.

7.6.7, which provided that each party would be responsible for half the capital gains taxes associated with the sale—the act of deducting the capital gains taxes from the gross proceeds would ensure that.

Moreover, the sale of the Rimcrest Property closed in April 2022. The amount of capital gains taxes owed on the sale would not be known until Jack and Elda filed their tax returns for Tax Year 2022—presumably in or around April 2023 at the earliest. Elda would be unable to accurately calculate how much Jack's taxes would be in advance because the amount of capital gains taxes Jack would owe on the sale proceeds depended on Jack's income, and could potentially depend on whether the Rimcrest Property qualified as his principal residence or, alternatively, what he did with the sales proceeds. (See, e.g., Topic no. 409, Capital gains and losses at <https://www.irs.gov/taxtopics/tc409> [as of Feb. 21, 2025], archived at <https://perma.cc/8465-4FYH> [listing circumstances in which the capital gains tax rate may be 0 percent, 15 percent, or 20 percent]; 26 U.S.C. § 121, subd. (a) ["Gross income shall not include gain from the sale or exchange of property if, during the 5-year period ending on the date of the sale or exchange, such property has been owned and used by the taxpayer as the taxpayer's principal residence for periods aggregating 2 years or more"]; *id.* at subd. (b)(1) ["The amount of gain excluded from gross income under subsection (a) with respect to any sale or exchange shall not exceed $250,000"]; 26 U.S.C. § 1031, subd. (a) ["No gain or loss shall be recognized on the exchange of real property held for productive use in a trade or business or for investment if such real property is exchanged

solely for real property of like kind which is to be held either for productive use in a trade or business or for investment"][16].)

Were the trial court's interpretation of "net proceeds" correct, the amount that Elda was entitled to be credited toward her $2,300,000 debt would not be known until April 2023 at the earliest—and perhaps not even until several years after that, should the parties not timely file or should the IRS or FTB have issues with the parties' filings. (See, e.g., 26 U.S.C. § 6501, subd. (a) ["Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed)"].) Given Jack's entitlement to monthly payments of $40,000 while Elda's $2,300,000 debt remain unsatisfied, such an interpretation would render Elda's obligation indeterminate and incapable of being fulfilled in a reasonable manner, despite best efforts by both parties, because her obligation to pay would be subject to the timing of any final determination by the IRS. "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.)

---

[16] We express no opinion on whether Jack would have qualified for a principal residence exemption or, alternatively, could have completed an exchange under section 1031 of the Internal Revenue Code. We note these sections merely as examples of why the amount of capital gains taxes associated with the Rimcrest Property sale could remain unknown for a lengthy period of time, especially if the taxing authorities disagreed with the parties' assertions on how the sales proceeds should (or should not) be taxed.

18

Finally, "[t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." (Civ. Code, § 1645.) While neither party submitted direct evidence as to how the term "net proceeds" was understood by real estate professionals, we note that in the "Seller's Final Closing Statement," the gross sales proceeds of $2,900,000 were reduced by a Documentary Transfer Tax and Property Taxes but there was no line item for capital gains taxes. (See also *In re Card* (Bankr. N.D.Cal. 1990) 114 B.R. 226, 228 [discussing situation in which "net proceeds" from sale of home "would be insufficient to satisfy the capital gains tax due upon the sale"—implying that "capital gains tax" was not deducted to reach the "net proceeds"]; Black's Law Dict. (12th ed. 2024) [defining "net proceeds" as "The amount received in a transaction minus the costs of the transaction (such as expenses and commissions)"].) From this, we conclude that, in real estate, the deduction of "taxes" from gross proceeds to arrive at net proceeds does not typically include the deduction of capital gains taxes.

The stipulated judgment did not require the deduction of capital gains taxes from the gross proceeds of the Rimcrest Property sale before crediting Elda with 50 percent of the remaining proceeds. Therefore, the trial court erred in concluding that Elda had failed to pay Jack the entire $2,300,000 debt.

### C. *We Deny Jack's Request to Dismiss the Appeal*

In his appellate brief, Jack requests that we dismiss Elda's appeal under the disentitlement doctrine. " 'An appellate court has the inherent power, under the "disentitlement doctrine," to dismiss an appeal by a party that refuses to comply with a lower

19

court order.' " (*In re Marriage of Cohen* (2023) 89 Cal.App.5th 574, 580.) " ' " 'Appellate disentitlement "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction." ' " ' " (*Ibid.*)

Jack urges us to dismiss the appeal because Elda allegedly has failed to make loan payments she is obligated to make, violated previous court orders, and conspired to have Jack's brother killed.

We deny Jack's request because he either fails to cite the record to support his allegations, or cites to trial court filings that he made—there is no record that the trial court found any of these allegations true.[17]

---

[17] Jack does cite to a portion of a court order that states: "The Court does find that the Petitioner delayed in the signature of the Deed for the Ridgecrest property (*See*: *Marriage of Hargrave* (1995) 36 Cal.App.4th 1313). The Court Orders the Petitioner to pay the Respondent $5,000 in sanctions pursuant to Family Code §271." However, without further context, we do not believe that this one instance warrants a dismissal of Elda's appeal under the disentitlement doctrine, particularly where Elda was already ordered to pay Jack $5,000 for whatever behavior the court found sanctionable.

## DISPOSITION

The trial court's order granting Jack's request for order is reversed.[18]  Elda is awarded her costs on appeal.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

_____

[18] Elda asks us to "remand the matter for a calculation of the amount to be refunded to Elda."  We decline to do so because nothing in the record indicates that Elda filed her own request for an order seeking a refund, and we have insufficient information regarding what other amounts may be owed by one party to the other under the stipulated judgment or otherwise.  If Elda believes that Jack owes her money, she is free to file her own request for order with the trial court.