418 So.2d 553 (1982)
Sharon W. LAMBERT and Donald G. Lambert
v.
MARYLAND CASUALTY COMPANY.
Nos. 81-C-2750, 81-C-2756.
Supreme Court of Louisiana.
June 21, 1982.
Rehearing Denied September 3, 1982.
*554 Arthur J. Lentini, Hall, Lentini, Mouledoux & Wimberly, Metairie, for applicant in No. 81-C-2750 and for respondents in No. 81-C-2756.
Fred Clegg Strong, Guy B. Scoggin, Scoggin, Strong & Kuhner, New Orleans, for applicant in No. 81-C-2756 and for respondents in No. 81-C-2750.
Marian Mayer Berkett, Matt J. Farley, Deutsch, Kerrigan & Stiles, New Orleans, for respondents in both cases.
PIKE HALL, Jr., Justice Ad Hoc[*]
Writs were granted to review a decision of the court of appeal reversing the district court's judgment for $9,866,739.50 in favor of plaintiffs and dismissing plaintiffs' suit for damages. Finding the result reached by the court of appeal on the merits of the case to be correct, we affirm the judgment of that court.
The factual background and procedural history of this litigation are chronicled in detail in the court of appeal opinion and in the reasons for judgment of the district court attached as an appendix to a dissenting *555 opinion in the court of appeal. Lambert v. Maryland Cas. Co., 403 So.2d 739 (La.App. 4th Cir. 1981). There are other reported cases involving the same parties. See Bank of New Orleans & Tr. Co. v. Lambert, 373 So.2d 550 (La.App. 4th Cir. 1979), writ denied, 376 So.2d 959 (La.1979); Lambert v. Cronvich, 373 So.2d 554 (La. App. 4th Cir. 1979), writ denied, 376 So.2d 960 (La.1979); Maryland Cas. Co. v. Lambert, 612 F.2d 229 (USCA 5th Cir. 1980); Bank of New Orleans and Trust Co. v. Lambert, 409 So.2d 294 (La.App. 1st Cir. 1982).
Donald G. Lambert and his wife, Sharon W. Lambert, filed this suit against Maryland Casualty Company seeking $33,000,000 in damages allegedly resulting from actions by Maryland, surety and creditor of a road contracting corporation wholly owned by plaintiffs, which brought about the financial collapse and bankruptcy of the corporation. After trial, the district court found that Maryland acted in bad faith and without legal right when, on October 1, 1975, it notified the state and other public bodies for which the Lambert corporation was performing road construction contracts to pay all contract funds to it and that Maryland's actions triggered the financial downfall of the corporation. Damages were calculated on the basis of the trial court's assessment of the value of plaintiffs' stock in the construction company and a related corporation. Maryland appealed. The trustee of the bankrupt Lambert corporation, who unsuccessfully attempted to intervene in the trial court after judgment was rendered, also appealed. The court of appeal, in an exhaustive opinion which dealt with numerous issues raised by the parties, ultimately determined that Maryland had the legal right under the contracts between the parties and good business reasons to take the action it did and, hence, there was no liability. Plaintiffs and the trustee applied for writs, which were granted.
Plaintiffs set forth the following assignments of error:
(1) The court of appeal erred in substituting its judgment for that of the trier of fact in the absence of a finding of "manifest error";
(2) The court of appeal erred in ruling that the plaintiffs should not be allowed to proceed individually to recover damages caused by the defendant;
(3) The court of appeal erred in ruling that Maryland had a perfected assignment of the progress payments due Lambert as of October 1, 1975;
(4) The court of appeal erred in ruling that Maryland had a right to contract funds as of October 1, 1975, by reason of legal subrogation;
(5) The court of appeal erred in ruling that Maryland is not liable to Lambert for a bad-faith breach of a fiduciary relationship; and
(6) The court of appeal erred in ruling that Maryland did not actionably abuse any of the rights it may have possessed.
The trustee in bankruptcy essentially adopts the plaintiffs' assignments of error relating to Maryland's liability, but additionally urges that the court of appeal erred:
(1) In affirming the denial of the trustee's petition to intervene in the district court; and
(2) In holding there was not sufficient evidence in the record to justify substituting the trustee for the plaintiffs as the party entitled to judgment in this case.
In response, Maryland urges the correctness of the court of appeal decision finding no liability on the merits of plaintiffs' claims. Maryland further urges its other defenses asserted in the trial court and court of appeal, including:
(1) Plaintiffs' claims have prescribed because this suit was not filed within one year after the occurrence of the events complained of;
(2) Judgments rendered in related federal court actions are res judicata as to the plaintiffs' claim for damages;
(3) Plaintiffs cannot assert a cause of action belonging to the bankrupt corporation;
*556 (4) Even if Maryland had no right to take the action it did, such action did not cause the financial collapse of the corporation or plaintiffs' damages;
(5) The trustee's intervention is untimely; and
(6) The damages awarded by the district court are excessive.
The primary issue in this case is whether on October 1, 1975, under the contractual relationship between the parties, there existed an effective assignment by the Lambert corporation to Maryland of contract funds due Lambert, thereby giving Maryland the legal right to direct the state and other public bodies to make payment of the contract funds to it as assignee. A second issue is whether Maryland, in exercising that right, breached its obligation of good faith performance of the contracts with Lambert or otherwise abused the rights it held. We conclude the court of appeal correctly decided these issues which are dispositive of the case.
The Lamberts were the sole stockholders of a corporation known as Donald G. Lambert Contractor, Inc., one of the state's largest road construction companies. In the normal course of business the corporation was required to furnish public works bonds under LSA-R.S. 38:2241, guaranteeing performance and payment. For many years Maryland had acted as surety on all of the corporation's bonds. In connection with the issuance of each bond the corporation and the Lamberts individually routinely executed an indemnifying agreement whereby the corporation and the Lamberts agreed to indemnify Maryland for any losses Maryland might suffer because of its execution of the bond being issued or any bonds previously or subsequently issued.
The indemnity agreement contains an assignment of the indemnitors' right, title, and interest in and to all tools, plant equipment, and materials, and in and to all subcontracts connected with the bonded contract, the assignment to be enforceable and effective should the indemnitors fail to discharge any obligations incurred in the performance of the contract, or be unable to complete the work in accordance with the terms of the contract, or in the event of any default on the part of the indemnitors under the contract, or in the event of a claim or default in connection with any other former or subsequent bonds executed for the indemnitors. Particularly pertinent to this litigation, the indemnifying agreement provides:
"In the event of claim or default under the bond(s) herein applied for, or in the event the undersigned shall fail to fulfill any of the obligations assumed under the said contract and bond(s), or in the event of claim or default in connection with any other former or subsequent bonds executed for us or at our instance and request all payments due or to become due under the contract covered by the bond(s) herein applied for, shall be paid to the Companyand this covenant shall operate as an assignment thereof and the residue, if any, after reimbursing the Company as aforesaid, shall be paid to the undersigned after all liability of the Company has ceased to exist under the said bond(s), and the Company shall at its option be subrogated to all rights, properties and interest of the undersigned in said contract, or contracts ...."
In the spring of 1974 the corporation was experiencing a severe cash flow problem because of high interest rates, the oil embargo and resulting shortage and higher cost of petroleum products, bad weather which delayed performance of and payment on major projects, and other factors. At that time the corporation had outstanding unsecured loans of $2,200,000 from the Bank of New Orleans & Trust Company and $547,000 from Hibernia National Bank in New Orleans. BNO, the Lamberts' principal bank, would not lend additional money without Maryland's guarantee of payment of any additional funds advanced and the furnishing of collateral to secure the existing indebtedness.
In May 1974 the corporation had in excess of $22,000,000 of unfinished construction contracts. In order to generate the cash needed for the corporation to continue in *557 business an agreement was reached between the Lamberts, BNO, and Maryland, and was reduced to writing on May 31, 1974. The letter agreement signed by the Lamberts recites that because the Lambert corporation and its affiliated firms and controlling stockholders are in immediate need of financial assistance because of a cash shortage, Lambert requests that Maryland assist Lambert by guaranteeing a loan of up to $2,000,000 principal amount to be made to Lambert by the Bank of New Orleans & Trust Company. To induce BNO to extend payment terms on its existing indebtedness and to induce Maryland to guarantee and BNO to advance the additional $2,000,000, Lambert agreed, inter alia, as follows:
"1. LAMBERT recognizes that the assignment of contract funds, materials, equipment and rights in subcontracts made by LAMBERT to Maryland in the various indemnity agreements, heretofore executed by LAMBERT, are now executory. LAMBERT confirms the aforesaid indemnity agreements and the effectiveness of those assignments as of this date and agrees to execute, when called upon by Maryland, whatever documents may be required to evidence to third-parties the effectiveness of the assignment."
The agreement further provides that Lambert recognizes that Maryland is not bound to issue further bonds to Lambert but will consider requests for additional bonds as each additional application is made and that Maryland reserves the right to refuse, in whole or in part, such applications. The agreement also contains the following provision:
"The undersigned recognize that the indemnity agreements heretofore or hereafter given by LAMBERT to Maryland are not modified or altered by any of the transactions contemplated by this letter, except to the extent that the indemnities are made executory as set forth in paragraph numbered 1 above."
The Lamberts further agreed to furnish additional security to secure both the existing and additional indebtedness including a pledge and assignment of all the stock in the Lambert companies, a chattel mortgage on all equipment and other movable property owned by the Lamberts, a pledge and assignment of all life insurance policies, a mortgage on any interest in real property owned by the Lamberts, and a pledge and assignment and/or chattel mortgage of whatever accounts receivable the Lamberts may have "other than the contract proceeds covered by the assignment already anticipated in item 1 above." The document contains numerous other agreements on the part of Lambert relating to the handling and use of funds, furnishing of reports, and obligating the Lamberts to execute the work in progress with maximum dispatch, to reduce overhead, and to dispose of all unneeded equipment at the earliest possible date and at the best price available.
BNO agreed to lend the Lambert corporation up to $2,000,000 principal amount and Maryland bound itself to BNO in solido for the repayment of the new loan. The loan was made and was thereafter renewed from time to time.
In December 1974 Maryland prepared notices of assignments of contract funds to be executed by Lambert and forwarded them to Lambert's attorney for execution. The notices were to advise the highway department and other public agencies of the executory assignments and authorize payment of contract proceeds to Lambert as agent of Maryland. Lambert declined to execute the notices, advising Maryland that if they were signed and delivered to third parties they would likely trigger adverse action by Lambert's creditors. Maryland apparently acquiesced, did not pursue the matter, and the notices were never executed.
By the spring of 1975 the Lambert corporation's financial condition had grown worse. In May 1975 Maryland guaranteed a $250,000 note held by Hibernia and Hibernia was given the right to share in the collateral pool created in the May 31, 1974 agreement.
During 1975 Lambert was pursuing claims in excess of $10,000,000 against the state for amounts Lambert claimed were *558 due under its contracts with the state. Suits had been filed by Lambert on most of the claims. Sometime between May and July the state offered Lambert $2,000,000 in settlement of all pending claims. The settlement was not accepted by Lambert, who made a counter offer of $5,000,000 to $6,000,000. The counter offer was not accepted by the state and the $2,000,000 offer remained viable. Lambert remained hopeful and had some encouragement from the governor that the settlement offer would be increased.
Also during 1975 claims exceeding $1,000,000 were made by various trade creditors of Lambert of which claims Maryland was given notice. Most of the claims were disputed and defended by Lambert. It was necessary for Maryland to bond out liens filed in connection with some of the claims, increasing its exposure on its performance and payment bonds.
In August 1975 Maryland agreed to consider advances of additional funds to Lambert and the parties' agreement was reduced to writing on August 20. The letter agreement recites that Lambert, who is in immediate need of cash, requests Maryland to advance from time to time as needed by Lambert, cash not to exceed $2,000,000. The letter provides that Maryland will not be obligated to grant the requests of Lambert but may in its sole discretion grant or refuse each or all of Lambert's requests as Maryland may elect. The letter stipulates how funds advanced are to be used and provides that the advances made by Maryland shall be repaid on or before January 30, 1976. Lambert recognized that Maryland was not bound to execute any additional bonds but would consider requests for the execution of additional bonds with Maryland reserving the right to refuse in whole or in part such applications. Particularly pertinent to this litigation the letter provides:
"(4) Under the existing executory assignment heretofore made by LAMBERT on March 31, 1973 (sic) to MARYLAND, which the parties reconfirm, MARYLAND has an assignment of all funds recovered by or to be recovered by LAMBERT in connection with any construction contracts of LAMBERT, or any of the persons included in that collective reference. LAMBERT anticipates that within a short period of time, it may recover substantial sums on claims and suits for extras and damages now pending against the State of Louisiana and other governmental bodies, which claims do in fact arise out of said construction contracts. If recovery is effected, LAMBERT will pay the sums recovered directly to MARYLAND first to the repayment of any advances MARYLAND may make under this letter agreement.
"(5) The undersigned recognize that the indemnity agreements heretofore or hereafter given by LAMBERT to MARYLAND are not modified or altered or extinguished by any of the transactions contemplated by this letter."
Pursuant to this agreement Maryland advanced approximately 1.1 million dollars to Lambert before October 1, 1975, and another $600,000$700,000 between October 1 and October 14, or a total of approximately $1,800,000.
In the latter part of September 1975 Maryland officials decided that the Lambert situation was hopeless. A meeting was called for the morning of October 1 at which meeting Maryland advised Lambert and the banks that it had irrevocably decided to write no further bonds for Lambert, to make no further cash advances, and to send to the Department of Highways and other public agencies letters notifying them of Maryland's rights of subrogation, exoneration, and assignment to the contract balances. Lambert and the bank officials were surprised at this unexpected action on the part of Maryland. Later that same day Maryland delivered the letter to the Department of Highways. Maryland realized this action would probably cause the financial collapse of the Lambert corporation but considered the action necessary in order to cut Maryland's losses.
During the next few days after the October 1 meeting, discussions were held between *559 Maryland, Lambert, and the banks in regard to allowing Lambert to continue with certain jobs. Maryland advanced an additional $600,000 to pay current bills. No agreement was reached and the Lambert corporation filed a Chapter XI petition under the Federal Bankruptcy Act. The attempted arrangement under Chapter XI failed and after an unsuccessful attempt to convert to a Chapter X proceeding the corporation voluntarily went into straight bankruptcy and a trustee was appointed. In the meantime the banks called their notes.
The bankrupt corporation's unfinished contracts were later formally declared in default by the public agencies. Maryland undertook completion of the outstanding contracts.
When the October 1 action was taken there was approximately $10,000,000 of unfinished work on the outstanding public works contracts. The bank notes were not in default, being due on November 30,1975. The advances under the August 20 agreement were not due for repayment until January 30,1976. The Lambert corporation was not in formal default on any of its contracts, although the highway department had notified the company that it was making insufficient progress on one of the principal remaining contracts.
At the time the October 1 action was taken, the corporation had been losing money, that is, generating less income than needed to meet expenses, for almost two years. Over $3,000,000 in loan indebtedness, in addition to the over $2,700,000 previously owed to banks by the corporation, had been incurred since May 1974, and remained unpaid. Maryland was faced with the prospect of having to make substantial immediate additional cash advances to meet the corporation's expenses, and made additional advances within the next few days after October 1. There existed substantial unpaid claims against the corporation, whether meritorious or not. The corporation's claims against the state had not been settled as anticipated. The evidence does not establish that the balances to be earned by the corporation on the contracts would have met or exceeded expenses or would have been sufficient to pay the loan indebtedness to the banks and Maryland. Plaintiffs' evidence that other arrangements for financing, bonding and completion of the contracts could have been made is scant and unconvincing.
The initial inquiry is whether Maryland, under its contracts with the corporation, had effective assignments of the contract proceeds which gave it the legal right to call upon the highway department and other public agencies to pay such proceeds to it as they came due. Plaintiffs argue that under the indemnifying agreements Maryland was entitled to be paid contract proceeds only in the event of default by the corporation on the contracts or if substantial claims were made against the bonding company, and that the corporation was not in default and substantial claims had not been made as of October 1, 1975. Plaintiffs argue that the May 31, 1974 agreement did not change or modify the requirement of default or claims as a condition to the effectiveness of the assignment.
On the other hand, Maryland argues, and the court of appeal held, that the May 31, 1974 agreement made the assignments effective and enforceable, and amounted to a waiver of the default or claims requirement.
Contracts must be construed in such a way as to lead to logical conclusions and to give effect to the obvious intention of the parties. St. Ann v. American Insurance Companies, 182 So.2d 710 (La.App. 4th Cir. 1966). They must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance. LSA-C.C. Art. 1946. A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage. LSA-C.C. Art. 1955; Polozola v. Garlock, Inc., 343 So.2d 1000 (La.1977); Reuter v. *560 Reuter's Succession, 206 La. 474, 19 So.2d 209 (1944); Solomon v. Hickman, 219 So.2d 330 (La.App. 1st Cir. 1969); Crow v. Southern Natural Gas Company, 210 So.2d 596 (La.App. 2d Cir. 1968), writ refused, 252 La. 834, 214 So.2d 160 (1968). Some effect is to be given to every word or clause if possible for a court may not impute to the parties the use of language without meaning or effect. American Mfg. Corp. v. National Union Fire Ins. Co., 203 La. 515, 14 So.2d 430 (1942); Gautreaux v. Harang, 190 La. 1060, 183 So. 349 (1938); Solomon v. Hickman, supra; Bruno v. McCabe, 71 So.2d 245 (Orl.App.1954).
When there is a doubt as to the true sense of the words of a contract, they may be explained by referring to other words or phrases used in the same contract. LSA-C.C. Art. 1948. Terms that present two meanings must be taken in the sense most congruous to the matter of the contract. LSA-C.C. Art. 1952.
Under the indemnifying agreements, the corporation agreed to indemnify and hold Maryland harmless from any and all liability for damages, loss, costs, charges and expenses incurred by reason of the execution of any bonds executed by Maryland for the corporation. For the protection of Maryland, the corporation assigned to Maryland all payments due or to become due under contracts covered by the bonds, such payments to be paid to Maryland in the event of claim or default under the bonds or failure of the corporation to fulfill its obligations under the contracts and bonds.
In the May 31, 1974 agreement, to induce Maryland to guarantee the $2,000,000 loan from Bank of New Orleans and for the protection of Maryland, the corporation recognized that "the assignment of contract funds ... made by LAMBERT to Maryland in the various indemnity agreements, heretofore executed by LAMBERT, are now executory." The corporation confirmed "the effectiveness of those assignments as of this date" and agreed "to execute, when called upon by Maryland, whatever documents may be required to evidence to third-parties the effectiveness of the assignment." The corporation recognized that the indemnity agreements were modified or altered "to the extent that the indemnities are made executory" as previously set forth in the agreement.
The meaning of the May 31, 1974 letter agreement is clear. The assignments of contract proceeds were made executory and effective as of the date of the letter, and the corporation agreed to sign notices to third parties of the effectiveness of the assignments. The assignments were made executory, effective and enforceable in the same manner as if there had been a default or claim as originally stipulated in the indemnity agreements, the original agreement being modified to that extent.
When it became necessary for Maryland to guarantee the $2,000,000 loan in order to obtain funds for the payment of expenses related to the corporation's bonded contracts which the corporation could not otherwise pay, the situation was virtually the same as if Maryland had been called upon to pay claims directly to suppliers, subcontractors, and the like. It was only reasonable and logical for Maryland and the corporation to agree, as they did, that the assignments should, at that time, become effective as in the case of default or claims.
Plaintiffs argue that the word "executory" means contingent and incomplete and that, consequently, the May 31 agreement did not have the effect ascribed to it by Maryland, or at best the agreement was ambiguous and that the ambiguity should be construed against Maryland, the drafter of the agreement. Plaintiffs do not, however, advance any suggestion as to what was meant or intended by the language used in the May 31 agreement, arguing only that the agreement did not change or modify the contingent nature of the assignment as stipulated in the original indemnifying agreements.
The word "executory" can have more than one meaning, depending on the context in which it is used. Here, the word does not stand alone, but is used with the *561 word "effectiveness" and plainly means effective, or capable of being executed. The May 31 agreement by its express terms altered and modified the indemnifying agreements to the extent that it made the assignments of contract proceeds executory and effective as of that date. The intent and meaning of the agreement is further demonstrated by the corporation's agreement to execute, at Maryland's request, any documents necessary to notify third parties of the "effectiveness" of the assignments, notice to the debtor being required in order to make the assignment effective as to third parties. See LSA-C.C. Art. 2643; LSA-R.S. 9:3101, et seq.
The parties' agreement was reconfirmed in the August 20, 1975 letter agreement which recognized that "under the existing executory assignment heretofore made by LAMBERT ... MARYLAND has an assignment of all funds recovered by or to be recovered by LAMBERT in connection with any construction contracts ...."
As of May 31, 1974, Maryland had effective unconditional assignments of contract proceeds and the legal right to notify third parties from whom contract proceeds were due of the assignments and to require payment of the proceeds of the contracts to it as assignee. It is inconsequential that Maryland chose not to exercise that right until October 1, 1975, choosing instead at Lambert's behest to forego notification to third parties as being in the best interest of both the corporation and Maryland. That this forebearance on the part of Maryland did not amount to a modification of the May 31, 1974 agreement or a waiver of its rights thereunder is evidenced by the confirmation of that agreement contained in the August 1975 agreement.
Maryland had the legal right under its contracts with the corporation to take the action it took on October 1, 1975 in notifying the highway department and other public bodies to make payment of contract proceeds to it under its assignments. Plaintiffs argue that even if Maryland had the legal right to take such action, Maryland, nevertheless, breached the fiduciary relationship owed by a surety to its principal, breached its obligation of good faith performance of their contracts, and abused any rights Maryland held under the contracts.
These contentions of plaintiffs were analyzed, discussed in detail and correctly decided by the court of appeal. See 403 So.2d at pages 754-757.
Maryland was obligated to act in good faith toward the Lamberts and the corporation under their contractual relationship, LSA-C.C. Art. 1934, and particularly under their relationship as surety-principal-indemnitors. Good faith did not, however, require that Maryland continue to support the corporation by the advancing of additional funds or by continuing to forebear in the exercise of its rights, contracted at arms length, for its own protection against further liability and loss as surety, guarantor, and creditor. It is certain from the evidence that the corporation could not have completed performance of the contracts and payment of expenses arising out of the contracts without additional financial support from Maryland, which support Maryland as surety had no obligation to provide. Maryland's right to refuse requests for additional advances was expressly reserved in the August 1975 agreement. As previously stated, the evidence does not establish that the corporation could have made other arrangements for financing and bonding had Maryland informed Lambert of its intention to exercise its assignment rights prior to actually doing so; the evidence is to the contrary.
The same reasons apply to plaintiffs' abuse of rights argument. Maryland had a legitimate and serious interest in the exercise of its legal rights at the time and in the manner it did so, reasonably believing that the corporation could not meet its obligations under its contracts and that continued financial support of the corporation would not prevent or reduce the ultimate loss to either the corporation or Maryland. See Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353 (La.1977); Cueto-Rua, "Abuse of Rights", 35 La.L.Rev. 965 (1965); Stone, Tort Doctrine, 12 La. Civil Law Treatise, § 261 (1977).
*562 The holdings that Maryland had effective assignments of contract proceeds with the right to notify third parties thereof and to request payment thereunder, and that its legal rights were reasonably exercised in good faith without abuse thereof, are determinative of the case. Discussion of the other issues raised by the parties is unnecessary.
The judgment of the court of appeal is affirmed.
CALOGERO, J., dissents for reasons assigned by REDMANN, J., in dissent from the Court of Appeal Opinion.
DENNIS, J., dissents with reasons.
DENNIS, Justice, dissenting.
I respectfully dissent.
Although I agree that Maryland Casualty had the right to notify project owners of the assignment and to claim the proceeds due under the contracts, I nevertheless feel that the defendant's actions constituted an abuse of rights.
This Court expressly recognized the doctrine of abuse of rights in Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353 (La. 1977), and has employed a similar analysis in earlier decisions. Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 (1919); Onorato v. Maestri, 173 La. 375, 137 So. 67 (1931). See, generally, Herman, Classical Social Theories and the Doctrine of "Abuse of Right," 37 La.L.Rev. 747 (1977); Cueto-Rua, Abuse of Rights, 35 La. L.Rev. 965 (1975); Maynard, Abuse of Rights in France and Quebec, 34 La.L.Rev. 993 (1974); Catala and Weir, Delict and Torts: A Study in Parallel (Part II), 38 Tul.L.Rev. 221 (1964); Comment, Abuse of Rights in Louisiana, 7 Tul.L.Rev. 426 (1933).
The trial court's findings and the record in the instant case support a finding that Maryland's exercise of its rights resulted in a breach of the duty of good faith it owed to Lambert. See, Lambert v. Maryland Casualty Co., 403 So.2d 739, 770 (Kliebert, Judge, concurring) (La.App. 4th Cir. 1981); Id. at 758 (Redmann, Judge, dissenting). The exercise of a right should not be protected or enforced when it is against moral rules, good faith, or elementary fairness. See, Illinois Central Gulf Railroad Co. v. International Harvester Co., 368 So.2d 1009, 1014 (La.1979); Cueto-Rua, supra, at 996-99.
NOTES
[*] Judge Pike Hall, Jr. of the Court of Appeal, Second Circuit, participated in this case in the place of Justice Harry T. Lemmon, who recused himself because of his participation in the case while judge of the Court of Appeal, Fourth Circuit. LSA-C.C.P. Arts. 151 and 159.