# Supreme Court of Louisiana

The Opinions handed down on the **27th day of June, 2025** are as follows:

**BY Hughes, J.:**

2024-C-00676    *KELLY O. ORGERON VS. EDWARD J. ORGERON, JR. (Parish of St. Tammany)*

JUDGMENT IN FAVOR OF DEFENDANT REVERSED; JUDGMENT RENDERED IN FAVOR OF PLAINTIFF. SEE OPINION.

Retired Judge John Conery, appointed Justice ad hoc, sitting for Chief Justice Weimer, recused.

Retired Judge Joseph E. Bleich, appointed Justice ad hoc, sitting for Justice Crain, recused.

Retired Judge Martin E. Coady, appointed Justice ad hoc, sitting for Justice Guidry, recused.

McCallum, J., dissents and assigns reasons.
Cole, J., dissents for the reasons assigned by Justice McCallum.
Bleich, A.H.J., additionally concurs and assigns reasons.

**SUPREME COURT OF LOUISIANA**

**NUMBER 2024-C-00676**

**KELLY O. ORGERON**

**VERSUS**

**EDWARD J. ORGERON, JR.**

**On Writ of Certiorari to the Court of Appeal, First Circuit,
Parish of St. Tammany**

**HUGHES, J.**[*]

The plaintiff/ex-wife in this case contends the lower courts erred in failing to award her a community property share of the $16,949,000 in "liquidated damages" paid to her defendant/ex-husband, upon the termination of his employment as a college football coach in 2021. The liquidated damages were a contractual benefit guaranteed to the defendant by his employer, which became effective on January 14, 2020, forty-three (43) days before the defendant filed a petition for divorce on February 26, 2020.

The defendant/coach and Louisiana State University and Agricultural and Mechanical College ("LSU") signed three written agreements relevant to this litigation: **(1)** a "Binding Term Sheet Between [LSU] and Ed Orgeron," signed by LSU (through its Athletic Director, Scott Woodward) and the defendant/coach on January 23, 2020 and on January 25, 2020, respectively, and "[e]ffective as of

[*] Retired Judge John Conery, appointed Justice ad hoc, sitting for Weimer, C.J., recused.
Retired Judge E. Joseph Bleich, appointed Justice ad hoc, sitting for Crain, J., recused.
Retired Judge Martin E. Coady, appointed Justice ad hoc, sitting for Guidry, J., recused.

January 14, 2020 and ending December 31, 2025"; **(2)** an "Employment Agreement," signed by LSU (through its Interim President, Thomas C. Galligan, Jr.) on April 24, 2020, and by the defendant herein on April 22, 2020, with an effective or "Start Date" of January 14, 2020 and ending December 31, 2025; and **(3)** a "Termination Agreement," signed by LSU (through its Athletic Director, Scott Woodward) and the defendant/coach on October 17, 2021, with an effective date of October 18, 2021 through December 31, 2025.

The pertinent text of the January 14, 2020 Binding Term Sheet provided, in part:

> LSU may terminate the employment at any time for convenience, and in such event will pay to the Coach as liquidated damages an amount equal to 70% of Salary remaining in the Term at the time of termination and expressly waive any offset or mitigation obligation of Coach and related contracting entity regarding this sum. LSU may also terminate the employment for cause without further payment obligation pursuant to a mutually-agreed clause (as that term is defined in the current Employment Agreement) in the long-form Employment Agreement. Any payments due to Coach will be paid in equal monthly installments over the course of the remaining Term.

> …***This is a <u>legally binding</u> Term Sheet and shall be enforced and construed in accordance with the laws of Louisiana***, subject to approval by the LSU Board of Supervisors. Any civil action to enforce this Term Sheet shall be brought in a state or federal court having subject matter and personal jurisdiction over the parties in East Baton Rouge Parish, Louisiana. ***The parties agree and acknowledge that they will negotiate in good faith and to finalize a formal long-form Employment Agreement <u>that includes the terms set forth above</u>, all non-conflicting terms of Coach's existing Employment Agreement, and other terms which are customary in Division I-A head coach contracts*** within 90 days of this Term Sheet unless such period is extended by mutual agreement of the Parties, and that the successful negotiation and execution of such long-form Employment Agreement is a condition of this Term Sheet and continued employment. Upon execution and approval by the LSU Board of Supervisors, the long-form Employment Agreement will supersede the terms of this Term Sheet, but ***until that occurs, this Term Sheet remains in full force and effect***. [Emphasis added.]

As provided in the January 2020 Binding Term Sheet, the subsequent April 23, 2020 "long-form" Employment Agreement included, inter alia, the terms set forth in the January 2020 agreement as to liquidated damages upon termination

without cause, stating, in pertinent part: "[I]f LSU terminates employment during the Term without cause or for convenience, LSU will pay EMPLOYEE … liquidated damages equal to seventy percent (70%) of Base Salary Amount and Supplemental Compensation … for the remaining Term…." In addition, the express terms of the April 2020 long-form Employment Agreement specified a "start date" of January 14, 2020 – the same effective date as specified in the Binding Term Sheet.

A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage. **Lambert v. Maryland Cas. Co.**, 418 So.2d 553, 559-60 (La. 1982). Some effect must be given to every word or clause if possible for a court may not impute to the parties the use of language without meaning or effect. **Id**.

In denominating the January 2020 Binding Term Sheet an *agreement to agree*, the trial court effectively read out of the contract the language expressly stating the agreement was "legally binding" and "shall be enforced and construed in accordance with the laws of Louisiana," as well as being subject to "[a]ny civil action to enforce this Term Sheet," which was required to "be brought in a state or federal court having subject matter and personal jurisdiction over the parties in East Baton Rouge Parish, Louisiana." To conclude, as the trial court did, that despite this express contractual language, the parties did not mean the agreement to be enforceable is to disregard prominent portions of the January 2020 Binding Term Sheet.

Thus we conclude the trial court erred in failing to interpret the January 2020 Binding Term Sheet agreement as a binding and enforceable contract.[1] The two

---

[1] "Interpretation of a contract is the determination of the common intent of the parties." La. C.C. art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046. "The words of a contract must be given their generally prevailing meaning…." La. C.C. art. 2047. "Words susceptible of different meanings must be interpreted as having the meaning that best

3

provisions at issue here in the Binding Term Sheet – that it was a binding and enforceable contract and that there would be subsequent negotiations in order to enter into a more detailed "long-form" employment agreement, containing additional terms – do not conflict and, therefore, both should have been considered in the resolution of this matter. To set aside that portion of the contract's provisions making it binding and enforceable, simply because it was contemplated that it would be carried forward within the more detailed "long-form" employment agreement to be negotiated at a later date, was legal error, particularly when the new long-form agreement also contained the termination-without-cause provisions, effective on the same start date of January 14, 2020 (when the community of acquets and gains still existed between the plaintiff and the defendant).

We further conclude that the April 2020 Employment Agreement, in essence, continued and confirmed the termination-without-cause provisions set out in the Binding Term Sheet. Both agreements were conditional. The conditions were fulfilled by the approval of the LSU Board of Supervisors, when it approved the Binding Term Sheet at its March 6, 2020 board meeting. The long-form Employment Agreement, also effective January 14, 2020, was then approved by the Board at its April 23, 2020 meeting.

While both agreements indicated the long-form Employment Agreement would "supersede" the Binding Term Sheet, the material terms of the Binding Term Sheet were adopted and ratified in the Employment Agreement, including the effective date. This specific provision of the contract is the law between the parties.[2]

---

conforms to the object of the contract." La. C.C. art. 2048. "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. C.C. art. 2049. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. C.C. art. 2050. "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text…." La. C.C. art. 2056.

[2] "Contracts have the effect of law for the parties…." La. C.C. art. 1983.

The lower courts failed to recognize that even if the Employment Agreement could be considered a "new" obligation rather than a fulfillment of the requirements of the Binding Term Sheet, because it was made effective during the existence of the community, the contract is a community asset in which both husband and wife have an interest. Property acquired during the community is presumed to be community property. See La. C.C. art. 2340 ("Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property."). Because the relevant terms of the January 2020 Binding Term Sheet, as ratified by the 2020 Employment Agreement, were expressly binding and enforceable, and were effective during the existence of the community of acquets and gains existing between the parties, the agreement was a community asset.

The Binding Term Sheet and the long-form Employment Agreement contained a substantial pay raise, certainly as a reward for the winning of a national championship. That "income" is also certainly the pay or wages of the coach for the work he performs and would be separate property after the termination of the community. Other provisions provided for the exclusive services of the coach and for the possibility the coach could be terminated or fired "with cause." Other provisions addressed termination of the coach "without" cause. The school could fire the coach before the term of the contract ended simply because he was no longer wanted as a coach. In that event a formula provided the coach with liquidated damages.

All of these terms were to give the coach an incentive to sign a long-term contract that hopefully would keep him from leaving LSU to coach at Notre Dame or Auburn or some other school. The liquidated damages clause was one all parties likely hoped would never be used. But it had its value as a type of insurance, a security blanket, if you will, or a "golden parachute." The coach, and his wife, were

5

given the comfort, the assurance, the confidence, and the peace of mind, that even if his coaching was terribly unsuccessful, or even if for other reasons that could not be labeled as "for cause," the school felt the need to part ways, he would not do so empty handed. This comfort and peace of mind inured to the benefit of both husband and wife in the college football coaching business. Because this security blanket was provided for in the Employment Agreement, effective during the community, it was community property as would be any other community asset.

The liquidated damages provided for in the Employment Agreement cannot be classified as wages for work. If terminated without cause, the coach would no longer be working for the school, and he would be entitled to receive these agreed upon damages whether he worked or not. The Termination Agreement seems an attempt to convert these damages into wages for future work. But the school and the coach cannot agree to limit the wife's interest in the community asset.

Accordingly, we allocate to the plaintiff a one-half share of the net liquidated damages paid to the defendant, which amounts to $8,134,500.[3]

Having decided the issues before the court on this basis, we find no need to address the remaining assignments of error.

## DECREE

Accordingly, we reverse the district court judgment in favor of the defendant and render judgment in favor of the plaintiff, Kelly O. Orgeron, against the defendant, Edward J. Orgeron, Jr., in the amount of $8,134,500.

**JUDGMENT IN FAVOR OF DEFENDANT REVERSED; JUDGMENT RENDERED IN FAVOR OF PLAINTIFF**.

---

[3] Of the total $16,949,000 in liquidated damages at issue herein, $680,000 was paid to the defendant's agent, presumably for his services in negotiating the agreements with LSU on the defendant's behalf, and $16,269,000 in liquidated damages was paid, or are to be paid this year (the last three payments being due in June, July, and December, 2025), directly to the defendant and the corporation owned by the defendant (which was set up by him, for tax purposes, to receive salary, bonus, and/or incentive pay); one-half of the net liquidated damages that will ultimately be paid to the defendant amounts to $8,134,500.

SUPREME COURT OF LOUISIANA

No. 2024-C-00676

KELLY O. ORGERON

VS.

EDWARD J. ORGERON, JR.

On Writ of Certiorari to the Court of Appeal, First Circuit, Parish of St. Tammany

**McCALLUM, J., dissents and assigns reasons.**

The majority's decision to award Kelly Orgeron one-half of the sums Edward Orgeron received as liquidated damages following the termination of his employment by LSU is not based on any statutory or jurisprudential authority. In my view, the decision is result-oriented and does not comport with either our statutes or case law governing community property. Moreover, the majority's decision fails to follow the well-settled rule that a trial court's factual findings regarding the nature of property as being either community or separate are subject to a manifest error/clearly wrong standard of review. *Cosman v. Cosman*, 22-0694, p. 5 (La. App. 1 Cir. 1/10/23), 360 So. 3d 892, 896, *writ denied*, 23-00299 (La. 5/2/23), 359 So. 3d 1272. Here, there was no manifest error in the trial court's determination that the property at issue is Mr. Orgeron's separate property. For these reasons, I dissent.

Edward Orgeron, LSU's former head football coach, led LSU's football team in an impressive season, culminating in LSU's victory in the 2020 national championship. There can be no question that LSU's desire to retain his services shortly after this win generated two of the documents at issue in this case: the Binding Term Sheet ("BTS"), effective January 14, 2020 and the long-term Employment Agreement. Although the Employment Agreement was executed on April 23, 2020, it, too, had an effective date of January 14, 2020.

The BTS stated that the parties "agree[d] and acknowledge[d] that they [would] negotiate in good faith and to finalize a formal long-form Employment Agreement that includes. . . all non-conflicting terms of Coach's existing Employment Agreement, and other terms which are customary in Division I-1 head coach contracts within 90 days. . . . and the successful negotiation and execution of such long-form Employment Agreement is a condition of the [BTS] and continued employment." The BTS further provided that, once approved by the LSU Board of Supervisors, "the long-form Agreement [would] supersede the terms of the [BTS], but until that occur[red], this [BTS] remain[ed] in full force and effect."

The BTS also contained a termination clause which provided as follows:

> **Termination by LSU:** LSU may terminate the employment at any time for convenience, and in any such event will pay to the Coach as liquidated damages an amount equal to 70% of Salary remaining in the Term at the time of termination and expressly waive any offset of mitigation obligation of Coach and related contracting entity regarding this sum.[1]

On the eve of the deadline set forth in the BTS to confect a long-form agreement, the parties entered into the April 2020 Employment Agreement. This agreement, too, contained a termination without cause provision. It stated that "LSU shall have the right to terminate this Agreement without cause upon written notice to EMPLOYEE. . . . In such event, LSU will pay EMPLOYEE. . . liquidated damages, in lieu of any and all other legal remedies or equitable relief. . . ."[2] It further stated that:

> The parties have bargained for this liquidated damages provision giving consideration to the following. This is an agreement for personal services. The parties recognize that termination of this Agreement by LSU prior to its expiration by lapse of term would cause EMPLOYEE to lose the salary, supplemental compensation, fringe benefits, certain other LSU-provided benefits, and

---

[1] The BTS also had a provision for termination for cause (not at issue here).

[2] Under the Employment Agreement, Mr. Orgeron also had the right to terminate the employment without cause by similarly providing written notice to LSU.

possibly other income and benefits provided by third parties, which damages are impossible to determine with certainty. As such, the damages that may be suffered by EMPLOYEE in the event of termination of this Agreement by LSU without cause are difficult to presently and accurately estimate. In addition, the parties expressly agree that the liquidated damages herein are not in any way a penalty.

In the interim, on February 26, 2020, Mr. Orgeron filed for divorce and on April 28, 2020, the trial court issued a judgment terminating the community property regime. The judgment was retroactive to the date of the filing for divorce.[3] Thus, the community property regime ended on February 26, 2020.

Mr. Orgeron's employment with LSU was terminated without cause. On October 18, 2021, Mr. Orgeron and LSU entered into a Termination Agreement and another employment agreement obligating Mr. Orgeron to continue coaching LSU for the remainder of the season. The Termination Agreement required, *inter alia*, that Mr. Orgeron make personal appearances, allow LSU to use his name and likeness in the media and promotional materials, and refrain from employment as a head coach for any collegiate football team in the Southeastern Conference.

The Termination Agreement also provided that, "in lieu of payments for his future personal services as head football coach for the University," and "in full and final settlement of any and all obligations between the parties under the 2020 Employment Agreement," Mr. Orgeron would receive those liquidated damages as set forth in the termination clause of the Employment Agreement (*i.e.*, 70% of the salary remaining on his contract; roughly $17 million).

Those "payments" for "personal services as head football coach" can have only one meaning. Coupled with the formula to determine the amount of Mr.

_____

[3] This is consistent with La. C.C. art. 159, which provides, in relevant part: "A judgment of divorce terminates a community property regime retroactively to the date of filing of the petition in the action in which the judgment of divorce is rendered."

3

Orgeron's liquidated damages (70% of his remaining salary), it is obvious that these "payments" represent Mr. Orgeron's salary.

The issue in this matter is not whether the BTS was a binding and enforceable contract, or whether it was superseded by the long-term Employment Contract, as addressed in the majority opinion. The effect of both, or either, is the same – Mr. Orgeron was retained as LSU's head football coach for a period of time and, in the event he was terminated without cause, he would be entitled to 70% of the remainder of his salary under the termination provision. Nor do the various contracts require any interpretation. As the majority correctly observes, these contracts form the law between the parties, as set forth in La. C.C. art. 1983. However, even assuming the BTS was binding (by its terms, it was in force and effect until the Employment Agreement was executed), neither the BTS nor the Employment Agreement change the nature of the sums contemplated by the termination clause in the Employment Agreement and the Termination Agreement – all of the sums represent Mr. Orgeron's wages.

At the core of this case are two interrelated questions: (1) are the post-community wages and the payments made to Mr. Orgeron pursuant to the Termination Agreement considered community property? and (2) are the payments considered community property because the BTS was signed during the community regime and, although fully executed after the termination of the community, the Employment Agreement had an effective date retroactive to January 14, 2020 (during the community)? The answer to both of these is no.

As a preliminary matter, I disagree with the majority that "[t]he liquidated damages provided for in the Employment Agreement cannot be classified as wages for work." In my view, the documents make clear that the "liquidated damages" set forth in the termination clause **were** derived strictly from Mr. Orgeron's salary/wages. This fact is evident from all of the documents. The Employment

4

Agreement contemplated the nature of those damages, recognizing that Mr. Orgeron's termination without cause would result in  the loss of his "salary, supplemental compensation. . . ." More importantly, and consistent with the Employment Agreement, the Termination Agreement expressly stated that the "liquidated damages" were "in lieu of payments for his future personal services as head football coach;" *i.e.*, to compensate Mr. Orgeron for the loss "of salary, supplemental compensation, fringe benefits. . . ."

As all of the payments clearly relate to Mr. Orgeron's salary, I turn to the issue of whether they are community property. Louisiana Civil Code article 2338 defines community property as including "property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse . . . ."[4] Mr. Orgeron did not *receive* any sums under the Termination Agreement during the existence of the community regime; they were not "acquired during" the regime. Nor were any of the payments acquired because of any "effort, skill, or industry" on Mr. Orgeron's part *during* the community regime. To the contrary, they compensated Mr. Orgeron for his work as LSU's head coach *after* the termination of the community.[5]

As recently explained in the February 2025 update of the Louisiana Civil Law Treatise, Matrimonial Regimes:

> Wages paid in return for work done during the existence of the community are community, regardless of when the payment is actually made. The "property acquired," in the language of Civil Code Article 2338, is a right to payment at some point for the work done. If payment is made during the community for work done before its commencement, the money is separate. If payment is made after termination, but is *for work done during the community*, the money is community.

---

[4] Article 2338 reads in full: "The community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property."

[5] Notably, Mr. Orgeron received a raise with his new employment contract with LSU and Ms. Orgeron received her share of the increase in his salary until the community terminated.

Andrea Carroll, Bradford H. Feldera, Richard D. Moreno, § 3:2. Compensation for labor & substitutes, 16 La. Civ. L. Treatise, Matrimonial Regimes § 3:2 (5th ed.) (Emphasis added).

It follows that wages paid for work performed **after** the community terminates is separate property.[6] There can be no doubt that a spouse is not entitled to a continued interest or share in his or her former spouse's salary following the termination of the community property regime (except to the extent that a spouse's salary impacts spousal support under La. C.C. art. 111, *et seq.* – provisions that are not at play in this case). Indeed, as our case law indicates, "[w]ages earned by a spouse for work performed after the community terminate[s] are separate property." *Statham v. Statham*, 43,324, p. 9 (La. App. 2 Cir. 6/11/08), 986 So. 2d 894, 900. *See also*, *Shel-Boze, Inc. v. Melton*, 509 So. 2d 106, 110 (La. App. 1 Cir. 1987) (garnisher "was not entitled to retain [the wife's] wages after they became her separate property. As such, [the wife] is entitled to the reimbursement of all wages garnished after the termination of the community property regime. . . .").

Nor is there any doubt that, had Mr. Orgeron continued to be employed by LSU for the full length of time set forth in the Employment Agreement, Ms. Orgeron would have had no claim to any of his wages after the community ended. The fact that those earnings were, by virtue of his termination, reduced to "liquidated damages" does not change this fact. "Liquidated damages" has been defined by Miriam-Webster as "damages whose amount is agreed upon by the parties to a contract as adequately compensating for loss in the event of a breach."[7] Whether the

---

[6] Indeed, the majority seems to acknowledge this fact by stating:

> The Binding Term Sheet and the long-form Employment Agreement contained a substantial pay raise, certainly as a reward for the winning of a national championship. That "income" is also certainly the pay or wages of the coach for work he performs and would be separate property after the termination of the community." (Emphasis added).

[7] *See* https://www.merriam-webster.com/dictionary/damage#legalDictionary.

payments are deemed "liquidated damages" or are recognized as contractual severance pay, it is clear that the payments were for wages Mr. Orgeron would have otherwise received had he not been terminated.

A review of the few cases touching on the issue presented by this case informs that all sums Mr. Orgeron received after the termination of the community – both his salary until his termination and the sums paid pursuant to the Termination Agreement – are his separate property.

I recognize that a former spouse may be entitled to certain property after the termination of the community, if the property arose out of a spouse's effort, skill or industry during the community regime. In *Lanza v. Lanza*, 04-1314 (La. 3/2/05), 898 So. 2d 280, for example, this Court suggested that renewal commissions received after the termination of a community on insurance policies written *during* the existence of a community property regime could be community property if it could be shown that they resulted from the effort, skill and industry of the other spouse during the community. Observing that the burden was on the spouse claiming that the commissions were community, the Court remanded the case for such a determination. *See Id.*, 04-1314, p. 16, 898 So. 2d at 291 (wife "will have the burden of proving, by a preponderance of the evidence, which portion [husband's] post-community income resulted from policies initially issued during the community, and of those policies, how much of the resulting service compensation was due to [his] effort, skill, or industry exerted during the community."). *See also*, *Ross v. Ross*, 02-2984 (La. 10/21/03), 857 So. 2d 384, 397 (which found insurance renewal commissions *received* during the existence of the community on policies issued *prior* to the community were community property because they were the result of the former spouse's "effort, skill and industry exerted during the community regime."); *Due v. Due*, 342 So.2d 161, 165-66 (La. 1977) (where this Court held that an "attorney's interest in pending contingent fee contracts constitutes a patrimonial

7

asset which, if the contract is acquired during the marriage, forms part of the community *insofar as its value is based upon the attorney's services performed during the marriage*.") (Emphasis added).

More analogous to the instant case is *Kees v. Kees*, 509 So. 2d 189 (La. App. 1 Cir. 1987). There, ten years after the spouses were divorced, the husband was laid off of work and he received severance pay under a labor union contract. The wife argued that severance pay should be analogized to retirement benefits because it "represented property attributable to employment during the existence of the community" and "a contractual right which [the employer] bound itself to pay that vested after one year of employment by the [husband]." *Id*, 509 So. 2d at 190-91. Noting that there was no question that the severance pay, like that in the instant case, was received after the termination of the community regime, the court of appeal focused on "whether the *right* to the severance pay was acquired during the existence of the community" concluding: "We think not." *Id*., 509 So. 2d at 191 (emphasis supplied). It then found:

> The one-year employment requirement in this instance does not vest the employee with the certain contractual right of severance pay at the end of his employment; it merely establishes him as eligible to receive severance pay *if* all the other requirements for entitlement to severance pay are met. Thus, it is not connected with a certain future event, but merely a possibility—involuntary termination by the company because of excess manpower. It is significant that under the terms of the contract, an employee might never receive severance pay. Therefore, severance pay cannot be considered to be *acquired* until such time as the employee may be involuntarily terminated, if ever.
>
> ***
>
> . . . we hold that the severance pay received by appellee more than ten years after the termination of the community of acquets and gains between him and appellant is his separate property.

*Id*., 509 So. 2d at 191-92. (Footnote omitted; emphasis supplied).

The recent update to the Louisiana Civil Law Treatise, Matrimonial Regimes discussed severance pay as follows:

> Severance benefits *or "pay" provided an employee upon termination of employment can take many forms.* Classification of such benefits given after termination of a community regime following employment during the regime must focus on the conditions of the payment. To the extent a particular payment resembles retirement benefits (compensation for past work) it should be community and to the extent it resembles disability benefits (*compensating for future lost wages*), it should be classified as separate.

Andrea Carroll, Bradford H. Feldera, Richard D. Moreno, § 3:2. Compensation for labor & substitutes, 16 La. Civ. L. Treatise, Matrimonial Regimes § 3:2 (5th ed.) (Emphasis added).

Notably, courts of other jurisdictions have also found severance pay to be separate property. *See, e.g.*, *In re Marriage of Steinberger*, 111 Cal.Rptr.2d 521, 528 (2001), ("the right to severance pay was acquired not during the marriage, but at the time of [the wife's] signing of the new release of legal claims and her new agreement not to work for Compuware's primary competitors for three years. Because the right to severance pay was acquired after the parties separated, the trial court did not err in awarding the severance pay. . . as her separate property;" *Franklin v. Franklin*, 859 P.2d 479, 487 (Ct. App.1993) ("Husband presented sufficient evidence for the trial court to find that the lump sum payment [severance pay] was separate property because it was pay he received after the divorce, it compensated him for future earnings, and it was not additional retirement pay involving the community interest"); *In re Marriage of Bishop*, 46 Wash.App. 198, 203; 729 P.2d 647, 650 (1986) ("severance *or termination pay* is not a form of deferred compensation, but is primarily intended to alleviate the economic fallout from unexpected dismissal. . . [T]he possibility of such a payment being made in futuro should not be considered in striking a fair and equitable division of property. Thus,

when and *if* the divorced spouse acquires the right to severance pay upon dismissal, that spouse alone is entitled to the whole of such payment. . . [The] severance pay, received after divorce, is not community property) (Emphasis added); *In re Marriage of Holmes*, 841 P.2d 388, 390 (Colo. App.1992) ("the husband's right to severance pay is not part of his normal salary and benefit program as an employee, but is unilaterally provided to him by the employer to replace compensation which may be lost after he is terminated and before he has located a new job. In these circumstances the payments constitute future income, and the right to such payments is not marital property.").

The "liquidated damages" Mr. Orgeron received are indistinguishable from the severance pay discussed in all of the foregoing cases. While the Employment Agreement provided that that Mr. Orgeron would be entitled to liquidated damages in the event his employment was terminated without cause, the right to that pay arose only when he was terminated and the parties entered into the Termination Agreement, all of which occurred after the termination of the community. Moreover, all of Mr. Orgeron's wages, including the liquidated damages, were dependent on his fulfillment of his obligations under the contract, again all occurring after the community terminated. His failure to meet those obligations would have resulted in his termination for cause.

Thus, in my view, all of the wages received by Mr. Orgeron after the termination of the community, including the liquidated damages received in lieu of those wages, are his separate property. It is of no consequence that the BTS and/or the Employment Agreement had effective dates during the community. Neither provide a basis for Ms. Orgeron's claim to wages earned by and paid to Mr. Orgeron after the termination of the marriage. Although Mr. Orgeron had a contract with LSU, it expressly allowed either party to terminate the employment simply by providing written notice to the other. And, more importantly, it memorialized the

10

parties' obligations, including LSU's obligation to pay Mr. Orgeron "the Base Salary Amount annually, in 12 equal monthly installments, on LSU's regular monthly payroll date" (with certain supplemental compensation and incentive compensation). Ms. Orgeron had an interest in Mr. Orgeron's compensation received during the marriage, but that interest terminated when the community terminated. Again, a spouse's wages for work performed after the termination of the community are separate property. *Statham*, 43,324, p. 9, 986 So. 2d 900.

The majority's reasoning – that "[b]ecause th[e] security blanket [liquidated damages clause] was provided for in the Employment Agreement, effective during the community, it was community property" – could lead to absurd consequences. Take, for example, the situation where the spouse of a candidate for sheriff actively and heavily participates in the campaign and the candidate is elected for a four-year term. That sheriff then has a guaranteed salary for the ensuing four years. If the parties divorce shortly after the election, under the majority's reasoning, the sheriff's spouse would have a claim to the sheriff's salary for the remainder of his term. This is clearly contrary to our community property scheme.

The issue in this case is uncomplicated. All of the sums Mr. Orgeron received post-community – whether in the form of salary, supplemental salary, incentive compensation or liquidated damages (representing a portion of Mr. Orgeron's remaining salary under the Employment Agreement) were received by Mr. Orgeron for work he performed after the termination of the community property regime. It is all his separate property. I would therefore affirm the lower courts' decisions.

11

# SUPREME COURT OF LOUISIANA

# NUMBER 2024-C-00676

# KELLY O. ORGERON

# VERSUS

# EDWARD J. ORGERON, JR.

### On Writ of Certiorari to the Court of Appeal, First Circuit,
### Parish of St. Tammany

**BLEICH, Justice ad hoc, concurring.**[*]

The Community Property Regime existing between the defendant, Ed Orgeron (Ed), and the plaintiff, Kelly Orgeron (Kelly), was in effect on January 14, 2020. This fact is undisputed. The effective date of the Binding Terms of the Contract between Ed and LSU was January 14, 2020. The obligations of LSU to both Ed and Kelly were "set in stone," effective January 14, 2020. This was recited on more than one occasion in documents executed by LSU and Ed, who signed the documents on his behalf and that of Kelly.

Ed owed Kelly the highest duties as manager of their community assets. A portion of their community property included the benefits of the financial protection afforded them pursuant to the "termination without cause" language of the Binding Contract. These duties of Ed to Kelly included the following.

"A spouse is liable for any loss or damage caused by fraud or bad faith in the management of the community property." La. C.C. art. 2354.

"A spouse has a duty to preserve and to manage prudently former community property under his control in a manner consistent with the mode of use of that

[*] Retired Judge John Conery, appointed Justice ad hoc, sitting for Weimer, C.J., recused.
 Retired Judge E. Joseph Bleich, appointed Justice ad hoc, sitting for Crain, J., recused.
 Retired Judge Martin E. Coady, appointed Justice ad hoc, sitting for Guidry, J., recused.

property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect." La. C. C. art. 2369.3.

See also the excellent discussion of the **high standard of a fiduciary duty** owed by the managing spouse to the other spouse in handling community assets. *Cf.* "Katherine Shaw Spaht, Matrimonial Regimes," *46 La. L. Rev*. (1986). This fiduciary duty places one in an ethical position in which he must be trusted by those who would rely upon him.

As examples, shareholders must be able to rely on the fiduciary duty owed them by a corporate board of directors. A bank depositor must be able to rely upon the bank. A partner in a business partnership must be able to rely on his/her partner. Under our law, a married person in a community property regime must be able to rely on the fiduciary position, the highest level of trust, of his/her partner in the management of community property assets. This fiduciary duty does not magically disappear upon divorce.

Here the defendant through his agent indicated a gross lack of concern about his fiduciary duty owed to the plaintiff. Importantly, the agent possessed complete authority to speak on Ed's behalf, as he had multiple times before.

After the Binding Terms had been approved by LSU and Ed, a surreptitious request was made to LSU by Ed's agent on his behalf.

The agent sought a change to a major provision of the Binding Contract. He wanted *the effective date of an already executed contract changed*. He asked to change the true effective date of January 14, 2020 to a new date, April 23, 2020.

In this writer's opinion this was an audacious, nearly fraudulent attempt to move the effective contract date away from that which had been created and existed during the community property regime. As Ed was already working under the new

contract this made no sense, except for one major upheaval.

A "new start date" would have placed the contract provisions into the time frame of the separate property regime of Ed. This was an attempt to convert community property into separate property. Had this been accomplished, the financial security provided *to both* Ed and Kelly via the "termination without cause" provision in the community property contract would have been converted to the benefit of only Ed as the sole owner, not the owner of an undivided one-half interest.

It is unknown if the defendant himself came up with this scheme, if he did so in concert with the agent, or if the agent did this of his own volition. Yet this attempted "changing the effective date" chicanery, *of and by itself*, was indicative of a violation of the fiduciary relationship owed by one community partner to the other. Either individually and/or through his agent, Ed was not performing as a fiduciary protecting Kelly's interest in community property. The attempt to classify the contract as "new," thus attempting to have the valuable LSU obligations declared Ed's separate property, was at the very least unconscionable.

The significance of this request being made and then denied was twofold. First, it emphasized that all parties fully knew the real effective contract date as January 14, 2020. Second, there was no "new contract."

The value of the section of the Binding Contract to the Orgerons, allowing LSU to terminate the contract "without cause" with its attendant effects, is clear. This protection of the community asset provided Ed and Kelly as co-owners a great deal of financial security in the ever fluid and changing world of college coaching. This protection began on Jan. 14, 2020. The re-classification of this community asset to a separate property asset, by Ed alone, could not have been accomplished without Kelly's consent, which was never sought.

I concur with the majority opinion.